[No. 14826. Department Two. June 6, 1918.]

DAVID ROBINSON *et al.*, *Appellants*, v. C. R. WILSON *et al.*, *Respondents.*[1]

LANDLORD AND TENANT — CONDITION OF PREMISES — LIABILITY OF LANDLORD. Under a lease of a hotel building to be constructed according to plans and specifications, the maxim of *caveat emptor* applies, and the tenant cannot recover damages and loss of rental value through defects in the heating plant and seepage of water in the basement walls, where the building was constructed according to the plans and specifications.

SAME. Inadequacy of the plans would not constitute a breach of the lease, nor would inadequacy of the heating plant or seepage in the walls be evidence of breach.

SAME—LEASE—USE OF PREMISES—GUARANTY OF FITNESS. Under a lease of a hotel building containing no restrictions as to its use, a guaranty of the fitness of the building for hotel purposes cannot be implied.

SAME—REPAIRS—PERFORMANCE BY TENANT—WAIVER. The voluntary act of a landlord in making repairs to a heating plant does not waive his right to a strict performance of the lease by the tenant.

Appeal from a judgment of the superior court for Lewis county, Reynolds, J., entered July 9, 1917, upon findings in favor of the defendants, in an action for rent, tried to the court. Reversed.

[1]Reported in 173 Pac. 331.

*Forney & Ponder,* for appellants.

*C. D. Cunningham* and *W. H. Abel,* for respondents.

CHADWICK, J.—On June 20, 1914, appellants and respondents Samuel A. Agnew and C. R. Wilson entered into a contract of lease whereby appellants leased to respondents certain property in the city of Centralia. A building was in course of construction thereon. The parts of the lease material to this inquiry are as follows:

"For the term of five (5) years the said term to commence upon lessors giving to lessees notice in writing of the completion of the building now under course of construction on said premises, the said building to be three stories high and in accordance with the plans and specifications, except as to the first floor which is to be subdivided in accordance with the wishes of lessees, and said building to be completed on or about October 1st, 1914, and the said five years' term to commence five days after the giving of such notice, at the monthly rent or sum of four hundred ($400) dollars per month for the first twelve months of said lease, and the sum of four hundred and twenty-five ($425) dollars per month for the succeeding forty-eight months of said term, the said rentals to be paid monthly in advance, the first month's payment to be paid on the execution hereof, and the other monthly rentals to be paid monthly in advance as of the time as set for the commencing as this lease by the notice as aforementioned, during the full term hereof."

The building was completed in November, 1914, and on the 9th day of that month defendants went into possession and paid their rent up to and including the 15th day of February, 1916. On February 24, 1916, defendants notified plaintiffs that they would refuse thereafter to pay rent because of the neglect and refusal of appellants to put the building in a tenantable condition, in that they had failed to provide sufficient heating facilities, and that, as a result thereof, respondents

had been compelled to turn away guests; that, when the back rooms were properly heated, the front rooms were too cold for comfort, and when the front rooms were properly heated, the back rooms were uninhabitable because of the heat. A further delinquency was alleged in that appellants had failed to provide proper sample rooms. It seems that the sample rooms were in the basement and that water seeped through the walls and floor during the rainy seasons. In their notice of refusal to pay additional rent, respondents claimed damages for the expired term of $3,000, and for the future term of $12,000, and "you are therefore advised, as before stated in this letter, that the Wilson Hotel Company will no longer pay rent upon said premises until such conditions are eradicated, or satisfactory arrangement made for the settlement of these demands." On the 13th day of March, appellant gave respondents notice to pay rent, and on the 16th brought this action to recover the rent due in March and April, or $850.

Respondents answered, admitting the lease, and alleged affirmatively that the building was built to be used as a hotel and that it had not been constructed according to plans and specifications, in that the heating plant had not as much radiation as called for and that the valves were improperly installed, and that the building was not constructed of the best materials, and that the workmanship was not of the "best manner" employed by skilled mechanics. They alleged that the rental value was not to exceed $200 per month, and prayed for the difference between that sum and the sum of $400 and $425 per month which had been paid under the lease, and for damages for the remainder of the term in a like sum.

They also prayed for damages in the sum of $500 on account of the careless and negligent manner in

which appellants had attempted to repair the building. This item was in no way sustained. Appellants replied, denying generally. The testimony going to the condition of the heating plant and its workings is in sharp conflict. That there was a seepage through the walls and floor of the basement and to some extent through the south wall was established.

The court found that the building had not been built according to the plans and specifications in the particulars mentioned; that respondents had suffered a damage to the extent of $100 per month; figured the reasonable rental value at $325 per month; allowed respondents $2,000 less $850, the unpaid rent, and entered a judgment for the difference, being $1,150 with costs.

Without taking issue with the theory of the law entertained by the trial judge in the assessment of damages, and granting that the heating plant did not meet the requirements of the business and that water seeped into the basement and through the south walls, we are unable to follow him in his findings of fact.

The right of respondents to recover rests primarily in contract, and they are under a burden to show a breach of contract. The lease was executed long before the building was occupied and was drawn with reference to certain plans and specifications. If the plans were then inadequate, the infirmity would fall equally upon the contracting parties and there could be no recovery. For it is known of all men that "plans and specifications" do not insure habitable buildings. Some architects are artists, some have constructive genius, and some can draw "plans and specifications."

Likewise, if the building was not completed according to the plans and specifications, it was a fact susceptible of proof, and of which the proof of the inadequacy of the heating plant and the seepage in the walls

would not be evidence—certainly not when standing alone and unsupported by any testimony which would tend in the slightest degree to prove that the plans and specifications had been departed from. The only testimony found in the record in which plans and specifications are mentioned is that of a witness who says:

"The basement could have been constructed water tight, and if the mixtures called for in the plans and specifications had been properly placed the basement would not have leaked. The same is true of the south wall of the building. If this had been properly constructed it would not leak . . . The walls of the basement are not of the best possible construction as called for in the plans and specifications."

But he does not assume to say what the plans and specifications required.

Witnesses testified that the rental value of a building used for hotel purposes and heated as this one was and with seepage in the basement and through the south wall would be from $100 to $250 per month, but it is not shown that the hotel was not as adequately patronized as a hotel in a community the size of Centralia would have been patronized if conditions had been otherwise. It is true that one of the respondents testified that a number of traveling men had quit the hotel, but how many or for how long or whether it resulted in a money loss is not made clear. Many traveling men testified to their satisfaction with the hotel, two of them saying it was a favorite resort of traveling men, and one of them that it was often full to overflowing.

Both the contractor and the heating contractor testified that the building was built and the heat installed strictly in accord with the plans and specifications, and their testimony is not challenged. The building was accepted by the architect in charge, which is some evi-

dence that it was completed in accordance with the plans and specifications.

We think it will not be questioned that a landlord is not a guarantor of the fitness of a building for the purpose for which it is leased unless he binds himself by written contract. Nor will the fact that he knows the use to which it is to be put hold him to such liability where, as in this case, no restrictions are put upon the use of the building in the written lease.

"It is agreed by the authorities at the present time that, as a general rule, there is no obligation on the part of the lessor to see that the premises are, at the time of the demise, in a condition of fitness for use for the purpose for which the lessee may propose to use them. A lessee, like the purchaser of a thing already in existence, is presumed to take only after examination. The maxim *caveat emptor* applies, and if he desires to protect himself in this regard he must exact of the lessor an express stipulation as to the condition of the premises." Tiffany, Landlord and Tenant, § 86.

"As the landlord is under no obligation to the lessee, as regards the condition of the premises, or its fitness for the lessee's purpose, at the time of the demise, so he is under no obligation to the lessee, or to the latter's assignee, to keep the premises during the tenancy in a condition satisfactory to the latter. Accordingly, a landlord is not bound, as a general rule, in the absence of special stipulation, to make repairs or improvements on the premises in order to render them safe or fit them for the tenant's use. And as a result of this principle, the tenant cannot assert any claim against the landlord on account of injury to himself or his property owing to defects in the premises arising since the demise . . . Even though the premises are leased for a particular purpose, and any other use thereof is prohibited, the landlord is, it has been decided, under no obligation to keep them fit for such use." Id., § 87.

See, also, Taylor, Landlord and Tenant, § 327 *et seq.;* 24 Cyc. 1081.

And this rule is not for the benefit of the one or the other, but is the corollary of the rule that, where there is a written contract of lease general in its terms, a tenant cannot be bound by an oral declaration or general understanding that it was to be used for a particular purpose. 16 R. C. L. 729.

Respondents seek to sustain their recovery by asserting a promise on the part of the appellants to repair the heating plant, and by proof of the fact that the heating plant was changed at their request during the time they occupied the premises. It is urged that these things operated as a waiver and rendered appellants liable as if on a covenant to repair. A voluntary act of a landlord who makes repairs at the suggestion of his tenant but who is under no obligation to repair will not be held to be a waiver of the right to a strict performance. *Williamson v. Miller*, 55 Iowa 86, 7 N. W. 416; *McClure v. Little*, 19 L. T. 287.

The rule that exempts the landlord from the penalty of an involuntary waiver is the same rule that exempts the tenant from a waiver of the landlord's covenant to make repairs by the payment of rent. *Hardman Estate v. McNair*, 61 Wash. 74, 111 Pac. 1059; *Shigeta v. Gaffney Inv. Co.*, 72 Wash. 221, 130 Pac. 88; *Thomson Estate v. Washington Investment Co.*, 84 Wash. 326, 146 Pac. 617, do not militate against our holding. The first case asserts the general rule. The written lease fixed the use and it was provided that the building should not be used for any other purpose.

In the second case, the landlord entered in a contract to build a building according to certain plans and specifications which had been agreed upon between the parties. The lease provided that the lessee should take possession when the building was completed and thereafter the lessee would keep it in repair. When notice

was given that the building was ready for occupancy it was in a leaky condition and the lessee refused to take possession. The landlord thereupon, as a condition of present occupancy, promised to remedy the defect. We held that an occupancy under a concurrent promise made by the landlord under such circumstances was not a waiver of the lessee's right to insist upon full performance by the landlord. The case is distinguished upon its facts. The third case holds that the payment of rent is not a waiver of the tenant's right to recover for necessary improvements where the burdens of repair were on the landlord.

The trouble in this case is that we are asked to make a contract grounded in the equities incident to subsequent events, where the parties, who might have foreseen every incident and circumstances now relied on, failed to guard against them in their written contract. And this is where the trial judge fell into error. He says:

"I think, however, that it cannot be successfully disputed that in the extreme wet months of the year there are defects in the building and heating plant, which are not within the contemplation of the lease, and which resulted in a loss to the defendants."

It may at times result in inequity, but the law is so written that a landlord is not bound beyond the terms of his lease, and that parties who enter written contracts are presumed to have in contemplation probable consequence and the established principles of the law.

Written contracts would be of little consequence in the business world if they were to be so overcome, or, if working to the disadvantage of one who has agreed to pay a certain price, his express contract could be turned, over the protest of his adversary, into a *quantum valebat*.

Reversed, and remanded with instructions to enter a judgment in favor of appellants for $850 and costs.

Mount, Holcomb, and Mackintosh, JJ., concur.