[No. 18740.   Department One.   January 9, 1925.]

THE ARNOLD-EVANS COMPANY, *Plaintiff*, v. J. A. HARDUNG, *Respondent*, W. E. BONZA *et al.*, *Appellants.*[1]

LANDLORD AND TENANT (69) — LEASE — COVENANT FOR REPAIRS — LIABILITY OF TENANT. Under a lease in which the tenant agreed to keep the building in good repair and return the same in as good condition as at the date of the lease, the tenant of an apartment house is not entitled to recover from the landlord the cost of a new boiler furnishing heat to the building, which the tenant necessarily installed when the bottom of the old boiler rusted out and could not be repaired (PEMBERTON, J., dissents).

Appeal from a judgment of the superior court for Spokane county, Blake, J., entered October 27, 1923, upon findings in favor of the plaintiff as against one defendant, in an action on contract, tried to the court. Affirmed.

*Corkery & Corkery,* for appellants.
*Davis, Heil & Davis,* for respondent.

[1]Reported in 232 Pac. 290.

TOLMAN, J.—The appellants, Bonza and wife, became the tenants of respondent, Hardung, April 1, 1922, occupying under an oral lease an apartment house in the city of Spokane, known as the Blackstone Apartments, for which they paid $300 monthly as rental. Later they entered into a written lease of the premises for the term of one year from the 15th day of October, 1922, for a total rental of $3,000, all paid in advance, with an option to renew for an additional year at $275 per month, to be paid monthly in advance. The provisions of the lease with reference to repairs, read:

"And It Is Hereby Agreed, that the parties of the second part are to maintain and keep said building in good repair and return same at the expiration of this lease to the party of the first part, its heirs, administrators or assigns in as good condition as at the present time, excepting that first party will make repairs to the exterior of premises occasioned by reasonable use and wear thereof."

Attached to the lease as a rider, or indorsed thereon, was the following provision, signed by both parties:

"It is further agreed in the foregoing lease that in the event that said premises shall be destroyed by fire or that second parties are unable to occupy the said premises on account of fire, that the unearned portion of the money deposited for the first year's rent shall be refunded to the second party by the first party, and that the second party shall have a lien upon any insurance money payable on account of such fire or destruction on account of fire for the payment of said sum, and in the event that any portion of said premises cannot be occupied, or that the said second party shall be dispossessed of said premises before the expiration of the first year's lease by the act of the first party or by process of law, without the fault or neglect of the second party, that then the unearned portion of said payment shall be refunded to the second party."

Early on the morning of January 2, 1923, the boiler of the heating plant in the leased building was found

to be leaking badly, and on examination it was found that the bottom of the boiler had rusted out, so that it was beyond repair, and that a new boiler was absolutely necessary. The building was then occupied by guests and tenants who required heat for their comfort and well-being, and something had to be done immediately. Appellant Bonza wired the landlord, respondent, who was a non-resident, advising him somewhat as to the situation, and without awaiting any reply to his telegram ordered a new boiler installed by the plaintiff at an expense of $939.25. Not having been paid therefor, the plaintiff brought this action against both the owner and the tenant for the price of the installation of the new boiler. The tenants Bonza crosscomplained against the landlord, Hardung, asking in effect that, if they were held liable to the plaintiff, they might have judgment over against Hardung. The case was tried to the court sitting without a jury, resulting in a judgment in favor of the plaintiff and against the appellants Bonza only, for the full amount claimed, and denying appellants any recovery from Hardung on their cross-complaint. From that part of the judgment denying appellants a judgment over against Hardung, the defendants and cross-complainants, Bonza and wife, have appealed.

Appellants urge, and the evidence tends to show, that this was not an ordinary repair, since it was testified that with proper care the new boiler would last practically a lifetime, and authorities are cited which distinguish between repairs and renewals or replacements. But, as we read the covenant, it is not simply a covenant to make ordinary repairs. The words: "to maintain and keep said building in good repair and return same at the expiration of this lease to the party of the first part, . . . in as good condition as at the present time, excepting that first party will make

repairs to the exterior of premises occasioned by reasonable use and wear thereof," when construed as a whole, and effect given to every part, seem beyond cavil to bear only the meaning which the trial court evidently ascribed to them.

"It is the well settled common law rule that a tenant's general covenant to repair the demised premises binds him under all circumstances, even though the injury proceeds from an act of God, from the elements, or from the act of a stranger, and if he desires to relieve himself from liability for injuries resulting from any of the causes above enumerated, or from any other cause whatever, he must take care to except them from the operation of his covenant. Under this rule, if the tenant enters into an express and unconditional covenant to repair and keep in repair, or to surrender the premises in good repair, he is liable for the destruction of buildings not rebuilt by him, though the destruction may have occurred by fire or other accident, or by the act of enemies, without fault on his part." 16 R. C. L. p. 1088, § 605.

In our own case of *Robinson v. Wilson,* 102 Wash. 528, it was said:

"We think it will not be questioned that a landlord is not a guarantor of the fitness of a building for the purpose for which it is leased unless he binds himself by written contract. Nor will the fact that he knows the use to which it is to be put hold him to such liability where, as in this case, no restrictions are put upon the use of the building in the written lease.

" 'It is agreed by the authorities at the present time that, as a general rule, there is no obligation on the part of the lessor to see that the premises are, at the time of the demise, in a condition of fitness for use for the purpose for which the lessee may propose to use them. A lessee, like the purchaser of a thing already in existence, is presumed to take only after examination. The maxim *caveat emptor* applies, and if he desires to protect himself in this regard he must exact

of the lessor an express stipulation as to the condition of the premises.' Tiffany, Landlord and Tenant, § 86.

" 'As the landlord is under no obligation to the lessee, as regards the condition of the premises, or its fitness for the lessee's purpose, at the time of the demise, so he is under no obligation to the lessee, or to the latter's assignee, to keep the premises during the tenancy in a condition satisfactory to the latter. Accordingly, a landlord is not bound, as a general rule, in the absence of special stipulation, to make repairs or improvements on the premises in order to render them safe or fit them for the tenant's use. And as a result of this principle, the tenant cannot assert any claim against the landlord on account of injury to himself or his property owing to defects in the premises arising since the demise. . . . Even though the premises are leased for a particular purpose, and any other use thereof is prohibited, the landlord is, it has been decided, under no obligation to keep them fit for such use.' Id., § 87.

"See, also, Taylor, Landlord and Tenant, § 327, *et seq.*; 24 Cyc. 1081.

. . . . . . . . . .

"The trouble in this case is that we are asked to make a contract grounded in the equities incident to subsequent events, where the parties, who might have foreseen every incident and circumstances now relied on, failed to guard against them in their written contract. And this is where the trial judge fell into error. He says:

" 'I think, however, that it cannot be successfully disputed that in the extreme wet months of the year there are defects in the building and heating plant, which are not within the contemplation of the lease, and which resulted in a loss to the defendants.'

"It may at times result in inequity, but the law is so written that a landlord is not bound beyond the terms of his lease, and that parties who enter written contracts are presumed to have in contemplation probable consequence and the established principles of law.

"Written contracts would be of little consequence to the business world if they were to be so overcome, or,

if working to the disadvantage of one who has agreed to pay a certain price, his express contract could be turned, over the protest of his adversary, into a *quantum valebat.*"

The reasoning in *Johnston v. Nichols,* 83 Wash. 394, 145 Pac. 417; *Clarke v. Yukon Investment Co.,* 83 Wash. 485, 145 Pac. 624, Ann. Cas. 1916E 625; and *Lodge Room Co. v. Pacific Bond & Inv. Co.,* 84 Wash. 150, 146 Pac. 376; tend towards the same results. The rider already quoted seems to fortify this view, since it permits of a refund of rental only in case of fire or dispossession without fault.

We need not inquire as to what would have been the liability of either party if the tenant had treated the failure of the boiler as an ouster, because that question is not here.

Though the law may seem harsh as applied to this particular case, yet, for the general good, it must be maintained, and landlords and tenants alike must be left to guard against unusual conditions by the terms of their contracts.

The judgment is affirmed.

Main, C. J., Bridges, and Mitchell, JJ., concur.
Pemberton, J., dissents.