## KING ET AL v. RICHARDS-CUNNINGHAM COMPANY

(No. 1809; January 9, 1934; 28 Pac. (2d) 492)

356

For the plaintiffs in error, there was a brief by *E. E. Enterline*, *Madge Enterline* and *Durham & Bacheller*, of Casper, Wyoming, and oral arguments by *E. E. Enterline* and *E. Paul Bacheller*.

358

For the defendant in error, there was a brief by *Hagens & Wehrli*, of Casper, Wyoming, and an oral argument by *Mr. William J. Wehrli*.

RINER, Justice.

Plaintiffs in error W. J. King and H. J. Rafferty, were the plaintiffs, and defendant in error Richards-Cunningham Company, a corporation, was the

defendant, in the district court. The parties will be hereinafter referred to as they were aligned in that court.

On the 27th day of February, 1925, the plaintiffs leased to the defendant, for the term April 1, 1925, to and including December 31, 1929, certain premises in the city of Casper, Wyoming, described as the "west ground floor store room, together with the basement beneath the same," some exceptions being reserved as to the basement space and not here material. The written lease prepared by the plaintiffs, among other provisions, contained the following:

"Lessee covenants with lessors that lessee has received said demised premises in good order and condition and that at the termination of this lease will yield up said premises and buildings to lessors in as good order and condition as when entered upon by lessee, loss by fire, inevitable accident or ordinary wear, excepted, and lessee further agrees to keep said leased portion of said premises and buildings in good repair during this lease at its own expense. * * *

"It is further agreed by and between the parties hereto that neither lessee nor its successors, will assign this lease or underlet said premises, or any part thereof, without the written consent of lessors first had and obtained thereto. * * *

"Consent to any proposed sublease shall not be arbitrarily withheld provided that the business to be conducted by any such sublessee shall not be in competition with or obnoxious to, any other tenant of the building; no sublease or subleases shall reduce or affect the liability of lessee in the matter of the rental reserved to lessors hereunder."

On even date with the lease, plaintiffs appear to have written the defendant a letter which bears the "O. K." of Otto H. Bolln, the manager of that corporation, the concluding sentence whereof read:

"It is expressly understood and agreed that in your remodeling of the leased premises, your company is to wall off the south portion of said premises at the expense of your company, such portion to be sublet by you for meat market or other legitimate purposes, provided that under any such sublease you do not violate the provisions of the lease referred to in the matter of other tenants of the building, the within consent being conditional upon your statement that no business to be conducted in said separated portion of said leased premises shall be obnoxious to any other tenant of our building."

Early in February, 1926, the defendant made an oral sublease of about the south 25 feet on the first floor of the originally demised premises, together with the basement space underneath which was slightly larger, to one Hufsmith, to be used by him for the purpose of a meat market. The latter promptly took possession of that portion of the premises thus sublet, and installed therein, in connection with his business, an ammonia refrigerating plant. This equipment was put in place by an employee of the Midwest Company and the Standard Oil Company, who had served in their oil refining works as refrigerating foreman for some 13 years and who was familiar with the equipment aforesaid. There was testimony on the trial that, prior to the time Hufsmith moved in, Bolln told King, one of the plaintiffs, about this sublease, and that King stated he was glad a tenant had finally been found; that prior, also, to Hufsmith's taking possession under the lease, both of the plaintiffs and Hufsmith together went into that part of the basement included in the sublease and discussed reinforcing the floor to support the cooling unit of the refrigeration plant, and that, thereafter, the floor was reinforced by the plaintiff Rafferty and his son, who did the work themselves.

The refrigerating plant, aforesaid, consisted of

the cooling unit located on the floor above, and a generator tank and a receiver tank both located in the basement. The generator tank was operated by applying heat from natural gas burners to the exterior surface. The employee above mentioned testified that he inspected everything as he installed the plant, started its operation himself, and that he considered the equipment in good condition at that time. He also stated that, between February and September 26, 1926, he inspected the plant some ten or a dozen times. After its installation in these premises, Hufsmith himself operated the refrigerating plant, he having done so for three years previously while it was being used in another location. The defendant had nothing whatever to do with the actual management and operation of the refrigeration system.

On September 26, 1926, while the plant was being operated as usual and a short time after Hufsmith had left the premises to obtain his Sunday midday meal, an explosion occurred in the basement where the mentioned tanks were located, which ruined one of them and seriously wrecked the southern portion of the building. There seems to be no proof in the record as to what caused the explosion, Hufsmith testifying that when he left the plant to go home, it was operating at its normal pressure of 150 pounds. The safety valve, used to protect against abnormal pressure and set to release at 400 lbs. pressure, was found after the accident and tested, and the employee, aforesaid, testified that it was in good operating condition.

The plaintiffs repaired the premises, made demand on the defendant that it pay its proportionate amount of the cost of these repairs, relating to the demised property, and, upon its refusal to do so, brought this action, relying upon the covenants of

the lease dealing with the repair and redelivery of the premises, and which have been quoted above. The defendant based its defense upon the exception contained therein, claiming the explosion to be an "inevitable accident," within the proper construction of that language in the lease.

The case was tried to the court without a jury, with the result that the court made a general finding in favor of the defendant and against the plaintiffs, and entered judgment dismissing plaintiffs' action and that defendant recover of the plaintiff its costs.

It is urged, on plaintiffs' behalf, that the covenant relating to repair is absolute and cannot be regarded as affected by any of the exceptions contained in the redelivery clause, although both are contained in the same sentence in the lease. This position invokes the strict and severe rule, which seems generally to prevail, that a covenant on the part of the lessee to keep the demised premises in good repair without more, imposes on him the duty to rebuild when they are destroyed during the term, although he may be without fault, and regardless of the cause of the destruction. 36 C. J. 145 and cases cited. The Supreme Court of Massachusetts, construing the words of a covenant in a lease involved in the case of Cawley v. Jean, 218 Mass. 263, 105 N. E. 1007, which read:

"To quit and deliver up the premises to the lessor * * * at the end of the term in as good order and condition, reasonable use and wearing thereof, fire and other unavoidable casualties excepted, as the same now are,"

declared that:

"They are to be interpreted as words used in written instruments commonly are interpreted in accordance with general usage and understanding.

They seem to be reasonably plain. They impose on the lessee the obligation to make whatever repairs may be necessary in order that at the end of the term the estate may conform to the standard at the time fixed in the lease."

The exceptions mentioned in the lease clause thus construed were not involved in the litigation, but the court makes it quite plain that the language therein contained deals with the matter of repairs. See, also, Jaques v. Gould, 4 Cush. 384, 388. It seems to us quite evident that the two covenants both have to do with the matter of repairs during the term, and should be construed together. The authorities generally seem to take this view. See, also, Herboth v. American Radiator Co., 145 Mo. App. 484, 123 S. W. 533; Wanamaker v. Butler Mfg. Co., 136 App. Div. 265, 120 N. Y. S. 1000; Mills v. United States, 52 Ct. Cl. 452; Kann v. Brooks, 54 Ind. App. 625, 101 N. E. 513; Kirby v. Davis, 210 Ala. 192, 97 So. 655; Allen v. Fisher, 66 N. J. L. 261, 49 A. 477; Ball v. Wyeth, 90 Mass. 275.

The argument is presented that no sufficient proof was introduced by the defendant to establish that the explosion which injured the premises was an "inevitable accident," within the interpretation given those words by the courts. Necessarily, then, we must inquire how the authorities have construed such language. It may be remarked at the outset that it has been held by reputable courts that the words "inevitable" or "unavoidable," casualty or accident, are synonymous. Leland v. Empire Eng. Co., 135 Md. 208, 108 A. 570; United States v. Kansas City So. Ry. Co., 189 Fed. 471; Fowler v. Davenport, 21 Tex. 626; Haulenbeek v. Hunt, 49 App. Div. 47, 63 N. Y. S. 405.

In the field of the law of negligence, we find 20 R. C. L. 17 stating:

"It has long been recognized that no action will lie for injuries attributable to what is termed inevitable or unavoidable accident. In other words, if no fault or negligence is chargeable to either of the parties to the occurrence upon which the action is founded the loss and injury will be allowed to remain where it has fallen."

So, in Newport News etc. Co. v. United States, 61 Fed. 488, 490, 9 C. C. A. 579, 580, Judge Lurton said:

"What is an inevitable or unavoidable accident has been very thoroughly considered by this court in the case of Weeks v. Transit Co., 61 Fed. 120. It was there said that an inevitable accident—'Was an occurrence which could not be avoided by that degree of prudence, foresight, care, and caution which the law requires of every one under the circumstances of the particular case.'

"Again, we said:

'An accident is said to be inevitable when it is not occasioned in any degree, either remotely or directly, by the want of such care and skill as the law holds every man bound to exercise.'

These definitions apply to an unavoidable accident, which is, in the sense of the law, an inevitable occurrence, as defined in that case, and those cited therein."

The Supreme Court of Maryland, in Dwyer v. Chew, 149 Md. 281, 131 A. 350, says that:

"An unavoidable accident, as a subject of judicial inquiry, is one which could not have been obviated by the exercise of legally requisite care by any of the persons whose responsibility for the occurrence is asserted or denied."

In Dygert v. Bradley, 8 Wend. (N. Y.) 469, the court said:

"When we speak of an unavoidable accident, in legal phraseology, we do not mean an accident which it was physically impossible in the nature of things for the defendant to have prevented; all that is meant is, that it was not occasioned in any degree either remotely or directly, by the want of such care or skill as the law holds every man bound to exercise."

And in Massachusetts, Chief Justice Shaw, in the case of Brown v. Kendall, 6 Cush, 292, used this language:

"To make an accident, or casualty, or as the law sometimes states it, inevitable accident, it must be such an accident as the defendant could not have avoided by the use of the kind and degree of care necessary to the exigency, and in the circumstances in which he was placed."

Numerous other utterances by appellate tribunals, to the same effect as those cited above, relative to the meaning of these words, could readily be supplied.

Some authorities hold that "unavoidable or inevitable accident" is synonymous with "act of God." Early v. Hampton, 15 Ga. App. 95, 82 S. E. 669; Fish v. Chapman, 2 Ga. 349, 46 Am. Dec. 393; McCall v. Brock, 5 Strob. (S. C.) 119; Russell v. Fagan, 7 Houst. (Del.) 389, 8 A. 258. Yet, Lord Mansfield, in the case of Trent Proprietors v. Wood, 4 Doug. 287, said:

"The general principle is clear. The act of God is natural necessity, as wind and storms, which arise from natural causes, and is distinct from inevitable accident."

And Chief Justice Cockburn, in Nugent v. Smith,

1 C. P. D. 19, 423; 45 L. J. Q. B. D. 19, 697; 1 E.
R. C. 218; remarked that:

"All causes of inevitable accident, *casus fortuitus*,
may be divided into two classes,—those which are
occasioned by the elementary forces of nature, un-
connected with the agency of man, or other cause,
and those which have their origin either in the
whole or in part in the agency of man, whether in
acts of commission or omission, of nonfeasance or
misfeasance, or in any other cause independent of
the agency of natural forces.

"It is obvious that it would be altogether incon-
gruous to apply the term "act of God" to the latter
class of inevitable accident. It is equally clear that
storm and tempest belong to the class to which the
term "act of God" is properly applicable."

In Ferguson v. Brent, 12 Md. 9, 71 Am. Dec. 582, it
is said:

"It is true that every act of God is an inevitable
accident, because no human agency can resist it;
but because it is so, it does not therefore follow, in the
sense of the books, that every inevitable accident is
an act of God. Damage done by lightning is an in-
evitable accident, and also an act of God; but the
collision of two vessels in the dark is an inevitable
accident, but not an act of God, such as the stroke
of lightning, nor is it so considered by the author-
ities."

So, in McKinley v. C. Jutte Co., 230 Pa. St. 122, 79
A. 244, the same idea is expressed thus:

"The terms 'inevitable casualty or accident' and
'acts of God' are not synonymous. 'Inevitable cas-
ualty' is a broader and more comprehensive term
than 'act of God.'"

The later Massachusetts cases, in defining "un-
avoidable casualty," seem to have given it a more
restricted meaning than that indicated by Chief Jus-

tice Shaw, supra, and, as comprehending injuries arising from supervening and uncontrollable force or accident. Welles v. Castles, 3 Gray 323. In that case, after announcing the interpretation of these words as indicated, we find this language employed, relative to a proviso in a lease under which a lessee claimed immunity from payment of rent because of injuries to the leased premises flowing from the neglect of the landlord to keep adjoining premises in repair:

"The language of the proviso is, 'in case the premises or any part thereof shall during said term be destroyed or damaged by fire or other unavoidable casualty;' that is, by causes like fire, such as lightning, earthquakes, and wind, which usually result without any direct agency of the tenant, and which are ordinarily beyond human control."

It is difficult to see why fire, which is frequently caused by human agency, should be classed with agencies such as lightning and earthquakes, which are exclusively beyond human control. The case of French v. Pirnie, 240 Mass. 489, 134 N. E. 353, 20 A. L. R. 1098, following the ruling of the case last above mentioned, held that damages caused by a bursting hot water heater in leased premises, on account of freezing of pipes in the attic of the building, such pipes being the conduits to an expansion tank, was not the result of "unavoidable casualty," under lease clauses governing surrender of the premises and abatement of rent. The trial judge told the jury that "the defendant was bound to foresee and prevent the accident by wrapping the pipe or heating the attic." In approving this instruction, the appellate court said:

"The freezing of pipes in this climate in the winter time is not an occurrence of an unusual, unex-

pected, or extraordinary character; it happens frequently in extremely cold weather; it cannot be said to be beyond human control."

It would seem, in deciding this case, the court was really applying the definition given by Judge Shaw, because the defendant could have avoided the damage by "use of the kind and degree of care necessary to the exigency." A later case, Leominster Fuel Co. v. Scanlon, 243 Mass. 126, 137 N. E. 271, 24 A. L. R. 1459, merely cited the two last mentioned decisions and held that the breaking of a plate glass window, through accident or negligence of a third person whose conduct was unconnected in any way with either the landlord or tenant, was not an unavoidable casualty within a lease clause relieving the tenant from repairs in case of "unavoidable casualty."

The same construction of the words last above quoted, as announced in French v. Pirnie, supra, was also adopted in Tays v. Ecker, 6 Tex. Civ. App. 188, 24 S. W. 954, where a leased building was condemned by municipal authorities as unsafe, and it was held that their action did not constitute "an unavoidable casualty," within a provision relieving the tenant from paying rent in such event, and that the tenant was liable therefor. The plaintiffs appear to rely on these decisions.

We are unable to perceive that the words whose construction is here in question should be held to have one meaning when defined in negligence cases and another quite different and restricted sense when used in the clauses of a lease. If there is any doubt as to which meaning was here intended by the language employed, the record before us shows that the lessors themselves prepared the lease, and, under a familiar rule, it should be construed most

strongly in favor of the lessee. 35 C. J. 1181, § 478, and cases cited.

But there is respectable authority to the effect that, when the words in question are employed in lease contracts, they have no other or different meaning than that ascribed to them by Judge Lurton, supra.

In 2 Underhill on Landlord and Tenant 905, the author states:

"If the tenant is exempt from damages which are caused by an inevitable casualty it is for the jury to determine upon all the proof whether the fire or other casualty which destroyed the premises, could have been avoided by his using diligence or skill in caring for the premises."

Where the owner of a building leased it to another, the contract had the following language in typewriting:

"Lessee shall use said building for dry cleaning and dyeing, and such other use as may be incidental thereto, or that may not be objectionable to said lessor, other than as aforesaid."

In printing, it contained this:

"And that at the end of said term he will deliver up said premises in as good order and condition as they now are, or may be put by said lessor, reasonable use and ordinary wear and tear thereof, and damage by fire and other unavoidable casualty * * * excepted."

During the course of the operation of the dry-cleaning plant installed by the lessee on the premises, an explosion occurred, fire ensued, and the building was destroyed. The owner sued to recover the value of the structure, contending that the clause, "fire and other unavoidable casualty * * * excepted,"

meant that "the casualty should be unavoidable in a strict sense and that a fire should also be unavoidable to be within the exception." The trial court took this view of the language thus used and required the defendant to show by a preponderance of the evidence that both explosion and fire were unavoidable. The jury, however, returned a verdict in favor of the lessee. In affirming the judgment entered thereon, in Karl v. Jackson, 12 Oh. App. 477, the appellate court said:

"It is contended that the evidence most favorable to defendant would still hold him liable for the destruction of the building, as the accident was not in a strict sense unavoidable. In determining whether the evidence supports the verdict, we are inclined to give a more liberal interpretation to this lease than that adopted by the trial court, and to hold that the printed and typewritten clauses above quoted should be construed together and harmonized. The typewritten clause gave express permission to the lessee to use the building for dry cleaning and dyeing. No unusual or extraordinary methods appear to have been employed, and no negligence in the operation of the plant is established by the evidence. Conceding, as we do, for the purposes of this case, that the printed clause standing alone might justify the construction put upon it by the trial court, yet taken in connection with the typewritten clause a fair construction of the whole lease would permit the lessee to install the usual equipment for a dry-cleaning establishment and to operate the same according to usual methods and with reasonable care under the circumstances. The lessee should not in our judgment be held liable for the results of a fire or explosion occurring in the ordinary operation of said plant without his fault or negligence. We think under this construction of the law and the weight of the evidence in the case the verdict and judgment should be sustained."

The case of Howeth v. Anderson, 25 Tex. 557, 78 Am. Dec. 538, was an action to recover damages for

the accidental destruction by fire of a steam sawmill and other property leased by the plaintiff to the defendants. The contracts bound the latter to redeliver the mill etc. in as good order as when received, usual wear and tear, and unavoidable accidents excepted. Judgment below went in favor of the plaintiffs. Reversing this, the reviewing court said:

"Looking to the terms and subject-matter of the contract, we do not think it reasonable or fair to conclude that the parties contemplated that the lessors were to become insurers of the property against those casualties which ordinary prudence and foresight could not have guarded against; or that it was supposed or intended that they were to become liable to repair the loss in case of the accidental destruction of the property by fire without negligence or fault on their part."

In Phillips v. The Sun Dyeing, Bleaching, etc. Co., 10 R. I. 458, the construction of a lease was involved containing a provision for the abatement of rent in case of the destruction of or damage to, so as to render untenantable, the demised buildings, "by accidental fire or other unavoidable casualty." Two steam boilers on the premises, used under low steam pressure and with a moderate fire, gave way to such an extent as to require replacement, requiring a shutdown of the factory for several weeks. Holding that the lessees were entitled to an abatement of rent during this period, the court said:

"The defendants also claim an abatement of the rent for the three weeks spent in replacing the broken boilers. They are entitled to such an abatement, if, within the meaning of the proviso, the rupture of the boilers was an 'unavoidable casualty.' The plaintiff contends that it was not a 'casualty,' but an occurrence in the natural course of things. We think, however, that we are to interpret the

words, not according to their strict and philosophical signification, which might defeat the intention of the parties, but rather in conformity with their popular everyday acceptation, and that in accordance with such an interpretation, there was in the rupture of the boilers a degree of unexpectedness, as of something unforseen and not contemplated in the making of the contract, which makes it proper to regard it as an unavoidable casualty within the meaning of the proviso."

In Rustad v. Lampert, 149 Minn. 363, 183 N. W. 843, the lessee, under the terms of his lease, agreed to yield up the demised premises "in as good order and condition and state of repair, reasonable use and wearing thereof and inevitable accident excepted, as the same now are." The boiler in the heating plant cracked or burst during the term, and the premises were surrendered in this condition. In a suit by the lessor to recover for this damage, the trial court found that the injury to the boiler was due to the negligence and careless handling thereof by the defendant. A judgment for the plaintiff was accordingly affirmed, the court saying that it was "incumbent on defendant, if he would avoid liability, to prove that the damage was due to the excepted cause. Underhill on Landlord and Tenant, § 537; Peck v. Scoville Manufacturing Co., 43 Ill. App. 360. The court might properly find that he had failed to do so."

Leased premises were burned "against the will, and without the negligence, or other default" of the lessee, and, in Hodgson v. Dexter, 1 Cranch, C. C. 109, Fed. Cas. No. 6565, this was held to be "an inevitable casualty" as to the tenant, within the meaning of a lease clause requiring him to yield up the premises in repair, but excepting such an event. In announcing its conclusion, the court said, in part:

"The question then occurs, whether a casualty which happens notwithstanding the use of the greatest degree of care and diligence on the part of the defendant to prevent it, is not, as to him, an inevitable casualty. It is unnecessary for us to inquire what degree of negligence is sufficient to charge the defendant, because the plea denies all negligence whatever. If issue had been joined on the plea, it might have become a question what degree of negligence the plaintiff must prove in order to maintain the issue on his part. The term negligence cannot be appropriated exclusively to the omission of any given degree of care and diligence. Its degrees are infinitely variable, from the omission of the greatest possible care, to the very boundary of fraud. I have no hesitation, therefore, in saying, that an accident which happens without the slightest degree of negligence or default of the defendant, is as to him, an inevitable casualty. * * * By common acceptation, unavoidable accident means, a casualty which happens when all the means which common prudence suggests have been used to prevent it."

Kelly, Admrx. v. Duffy, 8 Sadler (Pa.) 214, 11 Atl. 244, was an action wherein the plaintiff sought to recover from the defendant for the loss of a building by fire, on a provision contained in the lease under which the defendant held the premises, which required him to surrender said premises to Kelly "in as good order and condition as they were at any time during the term, ordinary decay and inevitable casualty only, excepted." It was held that the trial judge was correct in instructing the jury, in substance, that the lessee was not liable if he made every practicable effort which, under the circumstances, ought to have been made to save the building, this being a question of fact for their decision.

In The John Morris Co. v. Southworth, 154 Ill. 118, 39 N. E. 1099, a lease provided:

"In case said premises shall be rendered untenantable by fire or other casualty, the lessor may, at his option, terminate this lease or repair said premises within thirty days, and failing so to do, or upon the destruction of said premises by fire, the term hereby created shall cease and determine."

One of the steam boilers on the premises exploded, doing a great deal of damage to the building in which it was located. It appeared that the lessee had employed a competent experienced engineer long in charge of this particular boiler, and the preponderance of the evidence disclosed neither negligence nor mismanagement thereof on his part but, on the contrary, tended to show, so far as it could be determined, that a latent defect in the boiler caused the explosion. The lessee repaired the premises and withheld the rent to reimburse itself for so doing. The lessor brought an action to recover the rent thus retained. An opinion was filed on appeal reversing a judgment below in favor of the plaintiff, and from it we take the following excerpt:

"There being neither negligence nor default shown on the part of the lessee, he will be presumed to have used the greatest degree of care and diligence commensurate with the circumstances attending the business in which he was engaged. The burden of proving the converse of that presumption must rest on the lessor. By the terms of the lease a casualty which rendered the building untenantable for the entire purpose for which it was leased, and the option of repairing which within thirty days was reserved to the landlord, was one of the losses to be paid by the lessor. A casualty may be inevitable without happening by the act of God or caused by the public enemies of the country. Where the lessee is without negligence, and is presumed to have used the greatest degree of care the circumstances will permit, and an explosion such as this occurs, it is as to him, an inevitable casualty. (Cit-

ing cases)    The explosion must be regarded as the happening of a casualty causing damage to the building, etc., which, within the terms of the lease, was to be repaired by the lessor."

In the case at bar, the district court, as has already been indicated, made a general finding in favor of the defendant.    That finding, as we view it, necessarily negatives any claim that the explosion occurred through any negligence on the part of the defendant, if there is substantial evidence to support such a finding, and we think there is.    Some of the established facts bearing on this point have been above recited, and there are others in the record.    It is hardly necessary to say that we may not, under such circumstances, interfere with the action of the trial court in reaching the conclusion it did. When the authorities cited above are considered in the light of this general finding made below, we are constrained to hold that the explosion in the leased premises was "an inevitable accident," within the exception of the lease covenant, and for the consequences of which the lessee was not liable.

In reaching this conclusion, we assume without deciding, that the lessee should be held responsible for any negligence shown on the part of its subtenant, which damaged the premises, so as to constitute an infraction of any of the covenants of the lease.

We are inclined to think, also, that any question which might arise under the maxim *res ipsa loquitur* is taken out of the case because of the proof offered by the lessee to establish absence of negligence on the part of its subtenant, and the trial court's general finding thereon in favor of the lessee.

It is suggested that the defendant did not allege, in its answer, any facts tending to show that the explosion involved in this controversy resulted from

an inevitable accident. But that pleading did allege that the "defendant was not guilty of any negligent act or omission which caused or contributed to cause such explosion; but that such explosion occurred entirely without any negligence of any kind whatsoever on the part of this defendant." We think that this allegation, unattacked by motion to make more definite, was sufficient to allow proof of absence of negligence in the installation and operation of the refrigerating plant. This court, in Garner v. Brown, 31 Wyo. 77, 223 P. 217, in response to a contention that a petition failed to state a cause of action, heretofore pointed out that:

"The general rule, well supported by authority, is that negligence is a mixed question of law and fact; that hence a petition charging defendant with an act injurious to plaintiff, with a general allegation of negligence in the performance of the act, is sufficient to withstand a general demurrer and need not be made more specific as to such allegations of negligence in the absence of a motion for that purpose."

As negligence may be charged in general terms, relative to a particular act or occurrence, no good reason is perceived why the absence thereof may not be so stated. Under the cited authorities, it would appear that it was sufficiently pleaded that the explosion was an inevitable accident.

The judgment of the District Court of Natrona County will be affirmed.

*Affirmed.*

KIMBALL, C. J., and BLUME, J., concur.