[No. 31323.   Department Two.   July 20, 1950.]

PUGET INVESTMENT COMPANY, *Appellant,* v. AUGUST H. WENCK *et al., Respondents and Cross-appellants.*[1]

[1]Reported in 221 P. (2d) 459.

*Kellogg, Reaugh & Smith,* for appellant.

*Little, Leader, LeSourd & Palmer,* for respondents and cross-appellants.

HAMLEY, J.—This is an action by a lessor against the lessee to recover damages resulting from the asserted breach of covenants to repair and maintain the building, and to use the premises in accordance with applicable laws and ordinances.

Puget Investment Company is the owner of a one-story and basement building of mill construction with brick walls, situated at 1415-1417, 1421-1425 Ninth avenue, Seattle. The building was constructed in 1923 or 1924, and has for many years been used for garage purposes. It is now known as the Paramount Garage. On March 28, 1946, the company leased the building to August H. Wenck, Ezra Royce and Barney Royce, copartners, doing business as Gray Line Tours. The lessees will be hereinafter referred to in the singular as lessee, defendant, or respondent.

The lease was for a term of one and one-half years, commencing July 1, 1946, and ending December 31, 1947. A monthly rental of three hundred fifty dollars was stipulated in the lease. The building, which was about twenty-three years old at the time the lease was entered into, was then in a bad state of repair. These conditions were known to the lessee before the lease was executed. Shortly after taking possession, the lessee expended in excess of three thousand dollars in making repairs and adding improvements to the building. During the term of the lease, the street level floor was used by the lessee as a private garage. The basement level was sublet, with the consent of the lessor, to one Jensen, who used it as a public garage and automobile repair shop.

On December 20, 1947, ten days before the expiration of the term, the lessor's attorneys wrote to the lessee, calling

attention to paragraphs (5) and (6) of the lease, and stating that

" . . . you are required under these paragraphs to do a large amount of work on the premises before the expiration of your lease."

Paragraph (5) of the lease pertains to repairs and maintenance and the condition in which the premises were to be when returned to the lessor. Paragraph (6) requires the lessee to "keep and use said premises in accordance with applicable laws and ordinances." The letter of December 20th suggested that a conference be held to discuss the matter. It is stated in the letter that there had been previous discussions of the matter, but this is denied by the lessee.

The lessee vacated the premises at the end of the term without having made any of the repairs demanded in the letter of December 20, 1947. Shortly thereafter the lessor instituted this action. The complaint states two causes of action, only the first of which is involved in this appeal. Paragraph VII of the complaint lists eighteen items of work which, it is alleged, defendant should have done under paragraphs (5) and (6) of the lease. Damages in the sum of $15,309 (not itemized) were alleged to result from defendant's failure to do this work. An additional one hundred dollars was claimed by reason of defendant's alleged action in removing and storing a certain neon sign.

The matter came on for trial before the court without a jury. Extensive testimony and numerous exhibits were received. We make brief reference to the individual items, for the purpose of indicating the character of the claims and the principal mitigating factors relied upon by defendant.

Items Nos. 1 to 3, as listed in the complaint, called for the installation of electrical equipment—conduit, wire, boxes and fixtures—which was wholly lacking when defendant took possession. Plaintiff contended that the second and third of these items were required to comply with the electric code of the city of Seattle. Item No. 4 called for the replacement of an electrical panel and the repair of electrical switches. The evidence was in conflict as to whether this

equipment was in working condition when defendant surrendered the premises.

Item No. 5 called for the installation of a new automatic sprinkler system in the basement, at a cost of $3,543.19, to replace one which was old, obsolete and not usable when defendant took possession. Plaintiff asserted that this installation was necessary to comply with the city building code. Item No. 6 related to glass breakage. Item No. 7 called for painting the interior of the premises, at a cost of $870. A good part of the interior had apparently been painted several years before. Defendant produced evidence to the effect that such interior painting in garage buildings of this class is unnecessary and serves no useful purpose as a protective measure or otherwise.

Item No. 8 called for the repair of the ramp door to make it self-closing. Plaintiff contended that this work was necessary in order to comply with the city building code. The evidence does not reveal whether this door had been self-closing at any time during the lease. Item No. 9 called for the repair of wood floor and beams at the north door on the main floor. Item No. 10, involving an expenditure of $1,593.77, called for the installation of a rolling fire door between the auto repair shop and the garage in the basement. It was claimed that this installation was necessary to comply with the building code. Item No. 11 was waived by plaintiff.

Item No. 12 involved the replacement of both first floor front doors at a cost of $843.34. Defendant's witness testified that these doors could be repaired at small cost. Item No. 13 related to the replacement of the basement door at the alley. Defendant at no time used this door and it was nailed up throughout the term of the lease. Plaintiff's witness estimated the cost of a new door at $339.49. Defendant's witness estimated the cost of replacing the door at from $150 to $175.

Item No. 14 called for the removal of existing partitions for the basement toilet, the installation of new partitions, and rebuilding and installing a sheet metal duct. It was not definitely established whether this facility was in the build-

ing at the time defendant took possession. There did not seem to be any evidence of disrepair, but it was asserted that these changes were necessary to comply with the building code.

Under item No. 15, plaintiff claimed $57.12 as the cost of removing certain rubbish. Witnesses for defendant denied that this was defendant's rubbish and also minimized the work involved in obtaining its removal. Items Nos. 16 and 18 called for structural repairs consisting of the replacement of columns, beams and joists. The total amount claimed under these two items was $1,995.31. Item No. 17 called for the replacement of two thousand square feet of flooring in the north section of the building. The testimony was in conflict as to the state of repair of most of the flooring. Defendant's witnesses testified that the flooring, as repaired by defendant, was adequate for the normal purposes of the building.

The evidence showed that the conditions requiring these repairs, with the possible exception of some of the glass, existed at the time the lease was signed and were due to decay and wear and tear which had already taken place; that many of the repairs were of a more or less permanent nature; that some of them have structural characteristics; that some items pertain more to improvements than to replacements or repairs; and that most, if not all, of them were principally for the benefit of the lessor.

The evidence further showed that the building was in better condition at the end of the lease term than it was at the beginning. There had been some wear and tear during the term (excepted in the covenant to repair), and some glass breakage, for which the court allowed recovery. On the other hand, the condition of the building had been substantially bettered by the repairs and improvements which defendant made at the beginning of the lease.

Several experienced garagemen testified that this building would be classified as a third-class garage. According to this testimony, a first-class garage is one with concrete walls and floors, electrically operated doors, and wider ramps and more convenient arrangements throughout. Ex-

cept with respect to compliance with certain laws and ordinances, the testimony was uncontradicted that the building, as repaired by defendant at the commencement of the term, was in an adequate state of repair to meet all the reasonable needs and requirements of defendant.

The evidence also showed that, after defendant vacated the premises, plaintiff had all of the repairs made, as listed in the complaint and set out above, except items Nos. 1, 2, 3, 7, 11, and 14. On the basis of the testimony as to the actual cost of the repairs made, and the estimated cost of repairs not made, plaintiff during the trial reduced its demand from $15,409 to $10,933.89. This included an allowance of $148.32 instead of the originally claimed one hundred dollars for removal of the neon sign. It included no allowance under item No. 11, as plaintiff waived that claim. At the close of plaintiff's case, defendant admitted liability in the amount of three hundred fifty dollars, and deposited that amount in the registry of the court.

The trial court took the case under advisement at the close of the trial on May 4, 1949. On August 26, 1949, a comprehensive memorandum decision was filed, in which the facts and applicable law were reviewed at length. The trial court allowed full recovery on items Nos. 6 and 9 and the $148.32 damages claimed for removal of the neon sign. The trial court also allowed fifty dollars of the $843.34 claimed under item No. 12; one hundred twenty-five dollars of the $339.49 claimed under item No. 13; and fifteen dollars of the $57.12 claimed under item No. 15. The remaining items were entirely disallowed. Findings of fact, conclusions of law and judgment for plaintiff in the sum of $738.53 were thereupon entered. Plaintiff has appealed, and defendant has cross-appealed.

Appellant's assignments of error present two principal questions. The first of these is whether paragraph (5) of the lease required respondent to make the repairs as listed in the complaint to an extent greater than recognized in the judgment entered. This paragraph of the lease reads as follows:

"(5) Unless otherwise provided in this lease, lessee, having ascertained the physical condition of said premises from a careful and complete inspection thereof, accepts said premises in present condition, no exceptions. At the commencement of the term of this lease lessee shall place and thereafter shall keep and maintain said premises in a neat, clean and sanitary condition and in a first class state of repair, all at lessee's expense; provided, however, that lessee's obligation to repair shall not extend to the outside walls, roof and foundation of the building, if any there be, in which said premises are located unless repairs thereto be necessitated by lessee's negligence. Pursuant to said obligation lessee shall promptly replace any glass in or hereafter installed in said premises whether the same be in windows, the front, doors or other places, which becomes broken or damaged, provided, however, that if lessee at lessee's expense takes out and maintains insurance against breakage and damage of said glass in an amount and in a company satisfactory to lessor or agent and lessor is named as the assured in the policy, then lessee shall be relieved of the obligation of replacing broken or damaged glass. At the expiration of the term of this lease or its earlier termination, lessee shall redeliver possession of said premises to lessor and lessee covenants and agrees that at the time of said expiration or termination said premises will be in the best physical condition in which they were at any time during the lease term, ordinary wear and tear and damage by fire not caused by lessee's negligence and other casualty not so caused, excepted."

It will be observed that the above-quoted paragraph contains three provisions, the first relating to the condition of the premises when the lessee takes possession; the second relating to the lessee's duty to repair and maintain the premises; and the third relating to the condition the premises are to be in when returned at the end of the term. The issue before us brings into question only the second provision, relating to the lessee's duty to repair and maintain the premises. To the extent that the lessee had such a duty, then it was concededly obligated, under the third provision, to turn back the premises in the state of repair called for.

Under the second provision of paragraph (5), respondent covenanted that at the commencement of the term it would

"place" and thereafter "keep and maintain" the premises in a neat, clean and sanitary condition and in a "first class state of repair"; it being provided that such obligation to repair did not extend to outside walls, roof and foundation of the building, unless such repairs were necessitated by respondent's negligence.

Appellant contends that all of the repairs listed in the complaint (except item No. 11 which was waived) were necessary in order to place the building in a "first class" state of repair. Respondent, on the other hand, contends that it made all repairs at the beginning of the term which were necessary to place the building in a "first class state" of repair. The primary issue on this branch of the case, therefore, is the construction to be given the term "first class state of repair" as used in this lease.

It is perfectly competent for the parties to a lease to place upon the lessee the obligation of making very substantial and even structural repairs at the commencement of, or during the course of, the lease term. Such a covenant may call for repairs not necessary to the lessee's use of the premises, and of primary benefit to the lessor. However, when this is the intention, the covenant is usually specific in itemizing the work to be done. Here there was no itemization of repairs to be made by the lessee at the commencement of the term, except with respect to glass breakage. The trial court allowed this item in full.

The making of repairs which will substantially improve the condition and value of the premises, when required under the covenants of a lease, constitutes a part of the benefit the lessor expects to derive from the lease, along with the payment of rentals. Accordingly, where a comprehensive covenant of this kind is intended, there is usually a provision giving the tenant free occupancy for a specified period, or some indication that stipulated monthly payments have been lessened because of the other benefits the lessor is to receive. For example, the lease involved in *Yakima Valley Motors v. Webb Tractor & Equipment Co.*, 14 Wn. (2d) 468, 128 P. (2d) 507, recites that, in considera-

tion of no monthly installments being required until a specified date, the tenant would spend not less than one thousand dollars in cleaning up the premises and making specified repairs and replacements. A year's rental of a six-year term was thus waived.

In the instant case the lease does not waive rentals for any part of the term, or in any other way indicate that the monthly rentals were reduced in consideration of the lessee making substantial repairs for the primary benefit of the lessor. The reserved rental of three hundred fifty dollars a month amounts to $6,300 for the eighteen-months term. Appellant now claims an additional $10,933.89 because of respondent's failure to make such repairs. This would increase appellant's monetary benefits under the lease one hundred seventy-three per cent above the total rental for the term. In reviewing a similar contention in *Second United Cities Realty Corp. v. Price & Schumacher Co.*, 242 N. Y. 120, 124, 151 N. E. 150, where the cost of the repairs would have about equalled the total reserved rent, the court said:

"That such a liability was to be cast upon the tenant by this lease could hardly have been within the contemplation of the parties."

The term "first class state of repair" has no precise and generally recognized meaning applicable under any and all circumstances. The meaning to be ascribed to such a term is to be drawn not only from a study of the leasing instrument, but also from a consideration of the surrounding circumstances; the type, age and condition of the building; the uses to which it is adapted; the use which the lessee is to make of the building; the character of repairs in question; and the lessee's need of such repairs. See *Codman v. Hygrade Food Products Corp.*, 295 Mass. 195, 3 N. E. (2d) 759, 106 A. L. R. 1354, where the court was called upon to construe the somewhat similar terms "in good tenantable repair" and "in good condition." See, also, 32 Am. Jur. 675, Landlord and Tenant, § 790; and the annotations in 45 A. L. R. 12 and 106 A. L. R. 1358.

In the instant case the building has long been used only as a public or private garage; it was in a somewhat dilapidated condition when respondent took possession; respondent expended on repairs and improvements a sum equal to almost half of the reserved rent for the entire term; the testimony is uncontradicted that, as so repaired, the building was entirely satisfactory for respondent's purposes. The trial court concluded that, under those circumstances, the repairs which were made (except as to items for which additional allowance was made) placed the building in a "first class state of repair" within the meaning of paragraph (5) of the lease.

We are in accord with the trial court's conclusions. Courts will not extend or enlarge the obligation of a lessee beyond the plain meaning of the language used and the intention existing at the time it was made. *Armstrong v. Maybee*, 17 Wash. 24, 48 Pac. 737, 61 Am. St. 898; *Anderson v. Ferguson*, 17 Wn. (2d) 262, 135 P. (2d) 302; 51 C. J. S. 1087, Landlord and Tenant, § 368. Ambiguities in a lease must be resolved in favor of the lessee. *Anderson v. Ferguson, supra*. Moreover, since the instrument was prepared by the lessor, it must be construed most strongly in favor of the lessee. *King v. Richards-Cunningham Co.*, 46 Wyo. 355, 28 P. (2d) 492.

Applying these familiar rules of construction, we are of the view that the term "first class state of repair," as here used, meant only such repairs as were reasonably necessary for the conduct of a private or public garaging business during the lease term in the kind of building in question. The items of repair which were disallowed did not fall in this category—some were improvements instead of repairs; some were suitable to a modern first-class garage but not to a third-class garage; some were structural repairs beneficial to the lessor but not required for the purposes of the lessee during the term of the lease. Where items were allowed in part, we have examined the record, and conclude that the preponderance of the evidence does not call for revision.

In reaching this conclusion we have not overlooked the five decisions of this court cited and relied upon by appellant. These are *Armstrong v. Maybee, supra; Arnold-Evans Co. v. Hardung*, 132 Wash. 426, 232 Pac. 290, 45 A. L. R. 9; *Yakima Valley Motors v. Webb Tractor & Equipment Co., supra; Anderson v. Ferguson, supra;* and *Publishers Bldg. Co. v. Miller*, 25 Wn. (2d) 927, 172 P. (2d) 489.

The *Yakima Valley Motors* case is the only one of these involving a covenant requiring the lessee not only to maintain the building in the condition received, but to substantially improve the condition of the premises for the primary benefit of the lessor. It was there found that the lessee had made the required improvements, but had thereafter permitted the building to become run down during the term of the lease, and had returned the building in that condition to the lessor. Since this was a breach of the covenant to return the building in its repaired condition, the lessee was held liable. There was no question as to what repairs were required of the lessee—they were specified in the lease. Nor was there any question as to whether the lessee had originally made the required repairs. In both of these particulars the *Yakima* case is distinguishable from the instant case.

The four other cases involved only the obligation of the lessee to make repairs made necessary by conditions arising during the lease term. It was the general holding in these cases that, in the absence of any qualifying language, a general covenant of a tenant to repair obligates him to make all repairs necessitated by conditions arising during the term, even to the point of rebuilding in case the premises are destroyed. In the *Anderson* case it was held that this common-law rule is harsh and should not be applied unless the language of the lease clearly requires it. In the instant case, unlike the four cases last referred to, there is no question as to repairs made necessary by fire, explosion or other catastrophe, or by wear and tear, occurring during the lease term. Hence the general common-law rule announced and applied in those cases has no application here. In our view,

none of these five cited cases is pertinent to the issue before us.

We therefore hold that paragraph (5) of the lease did not require respondent to make repairs to a greater extent than recognized in the judgment entered.

The other question presented by appellant's assignments of error is whether paragraph (6) of the lease required respondent to make repairs to an extent greater than recognized in the judgment under review.

As indicated in the summary of the individual items set out above, appellant contends that the repairs listed under items Nos. 2, 3, 5, 8, 10 and 14 were called for not only under paragraph (5) of the lease, relating specifically to repairs, but also under paragraph (6), requiring compliance with applicable laws and ordinances. This latter paragraph of the lease reads as follows:

"(6) Lessee shall at all times keep and use said premises in accordance with applicable laws and ordinances and in accordance with applicable directions, rules and regulations of public officials and departments, at the sole expense of lessee. Lessee shall not overload and shall permit no waste of, or damage or injury to the premises and at lessee's sole expense shall keep all drainage pipes free and open, shall protect water, heating and other pipes so that they do not freeze or become clogged, and shall repair all leaks in said pipes. Lessee shall pay all damages caused by the failure of lessee to perform any of the foregoing obligations. Lessee shall further keep all sidewalks and areaways abutting upon said premises free and clear of snow, ice and obstructions."

Representatives of the Seattle fire department inspected the premises from time to time. On October 10, 1947, less than three months before the expiration of the term, the fire department sent letters to respondent and his subtenant, Jensen. These letters called attention to certain conditions asserted to be in violation of city ordinances. The letter sent to respondent lists eight items, only one of which is involved in this action. This is the matter of covering unused flue openings, and was the item No. 11 listed in the complaint. Item No. 11 was waived by appellant during the course of the trial. The letter to Jensen also lists eight items,

three of them corresponding to items Nos. 5, 8 and 10, as listed in the complaint.

The fire department letters mention nothing in connection with items Nos. 2, 3 and 14 of the complaint, which appellant also contends involved ordinance violations. However, for present purposes we will assume that all of the items of the complaint referred to on this branch of the case involve work which was required in order for the lessee to fully and strictly comply with applicable laws and ordinances of the city of Seattle.

There is no question but that, if city authorities had forbidden respondent's use of the premises until these corrections were made, respondent would have had the responsibility of making such changes if it desired to continue using the premises. It is also clear that if respondent's violation of applicable laws and ordinances had occasioned appellant any expense in the nature of fines, abatement proceedings, or the like, respondent would have been obliged to reimburse appellant. These obligations of the lessee are definitely established by paragraph (6) of the lease.

But here the lessee has been able to make such use of the premises as it desired without strict compliance with such laws and ordinances. The letters from the fire department referred to only three of the six items now at issue, and as to them the lessee and its subtenant were not ordered to cease operations until the changes were made. They were only asked to give these matters their "earliest attention." Had the changes been immediately undertaken, it is doubtful it they could have been completed before the end of the lease term.

Appellant, as owner and lessor, has been subjected to no penalty or expense because of respondent's assumed violation of such laws. It is true that appellant will have to make these changes itself, at its own expense, if it desires to now operate the building as a garage. Appellant has, in fact, made these changes since the end of the term, except as to items Nos. 2 and 14. But this expense has not been occasioned by respondent's violation of the laws and ordinances, and would have been required even if the property had

stood vacant and unleased during the actual term of the lease.

We do not believe that a covenant of this kind should be construed as an affirmative obligation to repair, alter or improve. It is intended only to place upon the lessee rather than the lessor the responsibility for making any such repairs, alterations or improvements which the lessee finds necessary in order to enjoy the use of the premises; to indemnify the lessor for any expenses resulting directly from unlawful use of the premises; and to provide the lessor with a basis for requiring the lessee to cease any unlawful activity which may occasion expense for the lessor or damage to the reversion.

Appellant has cited *Lodge Room Co. v. Pacific Bond & Inv. Co.*, 84 Wash. 150, 146 Pac. 376, in support of its position. The lease there in question contained a clause prohibiting the tenant from carrying on any business not in conformity with law. The tenant found that, under applicable laws, it would be impossible to utilize the upper floor of the building until a fire escape was constructed. The tenant built the fire escape and then brought an action against the landlord for reimbursement. Judgment was entered for the tenant. We reversed because the lease itself made it plain that some alterations would be necessary to fit the premises for the proposed use, and that the tenant would pay for such alterations. Thus the case turned principally on a specific covenant to make initial repairs, and only incidentally on the covenant to conform with law. The tenant in the *Lodge Room Co.* case was forced, by the authorities, to make the improvement before it could use the premises. It did make that improvement. There was, accordingly, no question presented as to the tenant's liability for the cost of repairs or alterations not made during the term.

Speaking of the covenants requiring compliance with the orders of civil authorities, it is said in *Corpus Juris Secundum*:

"Courts are loath to extend provision of this character beyond their legitimate sphere, so that they have been held

not to include a structural change, or extraordinary and unforeseen building alterations, or such as would be tantamount to a reconstruction of the building itself, or such as are not within the terms of the covenant as properly construed." 51 C. J. S. 1096, Landlord and Tenant, § 368.

We conclude that paragraph (6) of the lease in question does not obligate respondent to reimburse appellant for the cost of any of the repairs or alterations specified in items Nos. 2, 3, 5, 8, 10 and 14, of paragraph VII of the complaint.

Respondent has cross-appealed, contending that the trial court erred in allowing recovery on any item except No. 6, relating to replacement of sixty pieces of glass. Respondent does not challenge the other allowances on their merits. On the contrary, respondent states in its brief:

"In all fairness, however, it must be conceded that the disposition of the case made by the trial court seems reasonable and just."

But respondent asserts that appellant should have given notice and made demand on respondent prior to the trial with respect to the individual items of repair. Had such demand been made, respondent argues, it would have enabled respondent to discharge such obligation without being subjected to the inconvenience and expense of litigation.

The lease in question contained no provision requiring notice and demand by the lessor relative to damages resulting from breached covenants. The letter of December 20, 1947, gave general notice that repair work was required pursuant to paragraphs (5) and (6) of the lease. Although the letter invited a conference on the matter, it drew no written response and no conference was held. It seems doubtful, under the circumstances, whether any more specific notice or demand would have been fruitful.

Where a demand before suit would avail nothing, commencing suit is a sufficient demand. *Hopkins v. International Lbr. Co.*, 33 Wash. 181, 73 Pac. 1113; *Kimball v. Farmers' & Mechanics' Bank*, 50 Wash. 610, 97 Pac. 748; 1

C. J. S. 1067, 1068, Actions, §§ 26, 27. The assignments of error on the cross-appeal are without merit.

The judgment is affirmed.

SIMPSON, C. J., ROBINSON, MALLERY, and HILL, JJ., concur.