[No. 9406–5–III. Division Three. September 14, 1989.]

ROBERT H. WILKENING, SR., ET AL, *Respondents,* v.
WATKINS DISTRIBUTORS, INC., ET AL, *Appellants.*

*Julie Twyford, Hugh Evans,* and *Evans, Craven &
Lackie; Harley Harris, Milton Rowland,* and *Paine, Hamb-
len, Coffin, Brooke & Miller,* for appellants.

*Joseph Delay* and *Delay, Curran, Thompson & Ponta-
rolo,* for respondents.

[As amended by order of the Court of Appeals October
19, 1989.]

MUNSON, J.—Watkins Distributors, Inc., et al, appeal a judgment awarding damages against them, as lessees and assignees, for the cost of replacing a hot tar roof of a leased warehouse and assessing attorney fees and costs. We affirm.

On June 11, 1975, Rake's Mountain Distributors, Inc. (Watkins)[1] entered into a 5–year lease of a warehouse[2] with the Olive Wilkening family (Wilkening). At that time, the east end of the building was being completed, and there were some interior alterations being made in the center section. That lease provided that the lessor would be responsible for structural defects during the first year and corrections would be made at lessor's expense. Thereafter, the lessor would have no responsibility for any defects "which may show up in the rental unit." Attached thereto was schedule B which indicated the repairs, improvements, and alterations to the premises required of Wilkening as a condition of the lease. Roofing was included in the list; testimony revealed schedule B referred to completion of the building's new construction including roofing.

Approximately 2 years later, the parties began negotiations for a new lease covering the same premises. On January 1, 1978, they executed a second lease, for a 150–month term, commencing January 1, 1978, and ending July 31, 1990. Rental rates were based upon a graduated scale with the highest payments being $5,490 per month from July 1985 to June 1990. The use again was specified as a wholesale beverage distributorship unless a change of purpose was consented to by the landlord. This lease contained a

---

[1]Rake's Mountain Distributors subsequently changed its name to Watkins Distributors.

[2]The warehouse building is 105 feet in width and approximately 507 feet in length. It is divided by two parapets which separate the roof into three sections. The first, the west end, was constructed in 1968, consisted of 13,000 square feet, was recoated in 1975 per the terms of the original lease and was reroofed in 1984. The second, the center section, was constructed in 1973, consisted of 24,000 square feet, and was reroofed in August 1986. The third section, the east end, was constructed in 1974, consisted of 13,000 square feet, and was reroofed in August 1986. It was to be used only as a wholesale beverage distributorship unless consent of the lessor was given.

general maintenance clause which placed the responsibility of maintaining and repairing the premises on the tenant and eliminated the language dealing with structural defects. Likewise, the leased premises were to be returned to the landlord in as good a condition as at the time of possession, subject to reasonable wear and tear. This lease was personally guaranteed by George Watkins and Gaston Oullet.

On September 1, 1981, Watkins sold its business to B&B Distributors, Inc., which assumed the subject lease and took possession of the premises. The 1978 lease stated it could not be assigned without Wilkening's written consent; no consent was given by Wilkening. Thus, the assignment did not release Watkins from its primary responsibility for performance. *OTR v. Flakey Jake's, Inc.*, 112 Wn.2d 243, 248, 770 P.2d 629 (1989). On March 1, 1983, B&B assigned its leasehold interest to Floor Supply Distributing, Inc., again without obtaining Wilkening's written consent. Nonetheless, as with B&B, Wilkening accepted the rent payments without objection.

In 1983 following significant water leakage, Floor Supply had the warehouse roof examined by a roofing contractor. This inspection revealed the roof's deteriorated condition and the need for an entire reroofing. The west end was in the worst condition.

On August 24, 1983, Wilkening's attorney sent Watkins a letter advising the roof on the west end was in need of immediate repair and maintenance; that Watkins was responsible pursuant to the lease to repair it; and absent action by Watkins, the roof would be repaired at Wilkening's direction and repayment sought. Watkins disagreed. Thereafter Wilkening had the west portion of the roof replaced at a cost of $8,828.82, and with a cover letter, sent the work invoice to Watkins seeking reimbursement. Watkins declined payment.

The rest of the roof continued to leak causing damage to Floor Supply's inventory. On October 9, 1985, Wilkening's attorney sent a similar letter to Watkins indicating the need to reroof the remaining portions. A bid was acquired

and forwarded to Watkins. Upon receiving no response, Wilkening had the work performed in August 1986. The total cost was $22,353.89. Once again, Wilkening's request for reimbursement was declined by Watkins based on a denial of liability.

Wilkening brought this action seeking reimbursement for the entire cost of the reroofing. There is evidence that a tar roof requires a maintenance coat of tar, usually applied with a mop, every 3 to 5 years. The original tar roof was guaranteed by the roofing contractor for 10 years provided this maintenance program is followed. While there is factual dispute as to the average age of a tar roof, the court found that the roof lasted beyond its life expectancy. The court further found it was the intent of the parties that this roof would "endure the leasehold period," *i.e.*, 15 years. The court concluded Watkins breached the general maintenance clause of the lease by failing to maintain the roof. Damages were imposed for the costs of roof replacement along with attorney fees and costs.

The primary issue is whether the lease's general maintenance provision imposes a duty upon Watkins as lessee to apply periodic hot tar treatments to the roof of the leased building.

In interpreting a lease, we examine the document itself and "determine the mutual intentions of the contracting parties according to the reasonable meaning of their words and acts." *Fisher Properties, Inc. v. Arden–Mayfair, Inc.*, 106 Wn.2d 826, 837, 726 P.2d 8 (1986). "[W]hat controls in a lease is the intent of the parties at the time of its execution, and the plain meaning of the language used." *Washington Hydroculture, Inc. v. Payne*, 96 Wn.2d 322, 328, 635 P.2d 138 (1981) (citing *Armstrong v. Maybee*, 17 Wash. 24, 48 P. 737 (1897)). "Leases are contracts, as well as conveyances, and as such the rules of construction that apply to contracts also apply to leases." *Seattle–First Nat'l Bank v. Westlake Park Assocs.*, 42 Wn. App. 269, 272, 711 P.2d 361 (1985), *review denied*, 105 Wn.2d 1015 (1986).

The 1978 lease, paragraph 7, provides in pertinent part:

> *MAINTENANCE*
>
> [T]he *tenant* shall have *sole responsibility* for the maintenance and repair of the rental unit covered by this lease. The *tenant* at its expense *shall maintain* the rental unit in *every respect,* in a state of good repair and in good condition throughout the term of this lease.

(Italics ours.) (The paragraph continues as to the tenant's duty to maintain sidewalks and access ways free of ice and snow, keep all drainage pipes open, the building properly heated, and replace any broken glass.)

Paragraph 8 states in part:

> *Tenant* shall assume, *exclusively,* full risk for damage to the rental unit including but not restricted to the building and fixtures which may result from fire, from the elements and from any other cause.

(Italics ours.) (The lease then speaks of the tenant's responsibility to maintain fire insurance.)

Paragraph 11 states in part:

> Upon termination of the lease the premises shall be returned to the possession of Landlords in condition as good as they are at the time possession thereof is taken by Tenant, subject, however, to reasonable wear and tear which will have taken place through normal use by Tenant.

There is no provision designating either party's responsibility for the roof, as was found in *Puget Inv. Co. v. Wenck,* 36 Wn.2d 817, 221 P.2d 459, 20 A.L.R.2d 1320 (1950) and *McManamon v. Tobiason,* 75 Wash. 46, 134 P. 524 (1913). Nor is there anything in the record to indicate the issue of maintaining the roof was discussed by the original parties to the lease or that Watkins and its assignees were aware, at the inception of the lease or assignment, that a tar roof required a mop maintenance every 3 to 5 years. Watkins defended on the theory that a roof was a structural part of the building, which might from time to time require major and permanent repairs, and thus not the tenant's responsibility.

*Washington Hydroculture, Inc. v. Payne, supra,* held in part that a general obligation to maintain the premises and

upon expiration of the lease surrender it in as good condition as when the lessee took possession, except for ordinary wear and tear, did not require lessee to rebuild the premises when it was destroyed by fire. Thus, the court overruled the common law as enunciated in *Armstrong v. Maybee,* 17 Wash. 24, 48 P. 737 (1897) and its progeny. However, as noted earlier, the court stated: "As we said in *Armstrong,* what controls in a lease is the intent of the parties at the time of its execution, and the plain meaning of the language used. . . . We will not extend the obligation of lessee beyond the plain meaning of the language used . . ." *Payne,* at 328.

 As noted previously, this lease provides the tenant has "the sole responsibility for maintenance and repair" of the unit, at its expense, in every respect; further, that the tenant "assume[s], exclusively, full risk for damage" to the unit, be it from fire, from the elements, or from any other cause. At the conclusion of paragraph 8, from which the preceding text was taken and after discussion of insurance coverage, the lease provides: "Landlords shall have no responsibility whatsoever." This combination of language imposes a heavy responsibility upon the tenant;[3] the trial court so found in holding the tenant responsible for maintenance in order to permit the roof to endure during the leasehold period. The court's findings are supported by substantial evidence.

We find Watkins' analogy to *Payne,* while not requiring rebuilding of a destroyed structure, is not applicable when replacement of a roof covering is a result of the tenant's failure to perform proper maintenance as required by the terms of the lease.

The lease provides for attorney fees.

---

[3]While examination of the lease language as a whole provides for such a result, a specific provision dealing with hot tar treatment, including time frames, and allocation of responsibility for the same would avoid such problems in the future.

The judgment is affirmed and the case remanded for determination of reasonable attorney fees on appeal.

THOMPSON, C.J., and GREEN, J., concur.

After modification, further reconsideration denied October 19, 1989.

Review denied at 114 Wn.2d 1003 (1990).