[Nos. 44577, 44578. En Banc. October 27, 1977.]

SEATTLE–FIRST NATIONAL BANK, as Guardian, Respondent, v. GENE J. BROMMERS, ET AL, Appellants.

SEATTLE–FIRST NATIONAL BANK, as Guardian, Respondent, v. GENE J. BROMMERS, ET AL, Defendants, ELLA M. BOTTIGER, Appellant.

*Asmundson, Rhea & Atwood,* by *David E. Rhea,* for appellants Brommers, et al.

*Boynton Kamb,* for appellant Bottiger.

*Graham, McCord, Dunn, Moen, Johnston & Rosenquist, Stephen A. Crary, Ben J. Gantt, Jr., Downes & Muir,* and *Michael D. Muir,* for respondent.

HAMILTON, J.—These two appeals arose out of the same trial. Appellants Gene J. and Jean Brommers, doing business as Brommers Logging and Brommers Logging and Construction Company, and appellant, Ella Bottiger, separately appealed from the trial court's judgment for respondent, Seattle–First National Bank, as successor–guardian of the estate of Henry F. Bottiger, an incompetent. The appeals concern the liability of the three appellants to the guardianship estate. We affirm the judgment of the trial court.

The findings of fact are largely undisputed. Henry and Ella Bottiger were married on November 11, 1953. Mr. Bottiger was injured in a logging accident on January 31, 1963, and since that accident has been mentally incompetent. Mrs. Bottiger was appointed guardian of his estate on April 9, 1963, and continued to serve as such until her resignation was accepted by the Whatcom County Superior Court on March 9, 1969. Respondent, Seattle–First National Bank, was appointed successor–guardian.

The guardianship estate was composed of Mr. Bottiger's separate property and Mr. and Mrs. Bottiger's community property. Included in this property were three parcels of unimproved real property containing standing timber, two of which were acquired by Mr. Bottiger prior to his marriage to Mrs. Bottiger, and one of which was acquired after the marriage. These three parcels of land were designated tree farms for selective cutting by Mr. Bottiger prior to his accident and were registered as such with the Industrial Forestry Association.

In the summer of 1965, feeling that she deserved some trips, Mrs. Bottiger decided to sell all merchantable timber on the three tree farms. On several prior occasions she had consulted with her attorney concerning the sale or lease of the guardianship property and was aware that court

approval was needed to dispose of such property. When she called upon her attorney regarding the sale of the timber, however, she did not seek permission to sell all merchantable timber as was her intention, because she feared he would not approve. In response to her visit, her attorney prepared a petition for authority to log and sell the alder, maple, and cottonwood on the three parcels. Mrs. Bottiger represented to the court in this petition that the alder, maple, and the cottonwood had reached an age that required logging to prevent these species from rotting. In accordance with this petition, the court entered an order on September 15, 1965, which authorized Mrs. Bottiger to enter into an agreement with her brother, appellant Gene Brommers, to log the alder, maple, and cottonwood, at 40 percent stumpage within 8 months of the court order. At the same time, the court entered an order authorizing Mrs. Bottiger to sell certain logging equipment to Mr. Brommers.

Mrs. Bottiger and Mr. Brommers then executed a written agreement for logging in accordance with the court order.[1] In spite of this written agreement, Mrs. Bottiger and Mr. Brommers entered into an oral agreement for Mr. Brommers to log all merchantable timber of every species, including poles, without a time limitation at 40 percent stumpage to the estate. Mr. Brommers commenced logging operations in the fall of 1965.

While the logging operations were continuing, Mrs. Bottiger told Mr. and Mrs. Brommers she would just as soon have some of the stumpage payments in cash, so that she would not have to report the receipt of this money to the court. She made this request, even though her attorney had advised her to keep accurate records of all income and

---

[1]None of the parties could find the original copy of the written agreement. The trial court admitted into evidence Mrs. Bottiger's attorney's conformed office copy of the agreement which purportedly showed that Mrs. Bottiger and Mr. Brommers had signed the original. (Exhibit 16.) Although Mrs. Bottiger admitted signing the agreement, Mr. Brommers denied ever seeing the agreement or signing it.

expenses for use in preparing her reports to the court. Mrs. Brommers, although aware of Mrs. Bottiger's status as guardian and of the reason the cash was desired, nevertheless paid Mrs. Bottiger in cash whenever requested to do so. Mrs. Bottiger received $10,349.18 in cash from the Brommers from the sale of the guardianship timber. Mrs. Bottiger kept no records of the receipt or disbursement of this cash and failed to report its receipt in her guardian's biannual report to the court. Mrs. Bottiger also received an additional $7,090.82 from the Brommers as payments on a note made in connection with the sale of the guardianship logging equipment, which she never reported to the court.

It was Mrs. Bottiger's impression at the trial that she used the above funds in part to finance a trip to Vasa, Finland, with her daughter by a previous marriage, which cost approximately $7,000; to purchase a Chrysler Imperial automobile in 1966 at a cost of $6,000; to finance a trip to Hawaii in 1968 which cost approximately $2,000; and to purchase a new Oldsmobile automobile in 1969, which cost approximately $4,000 with the trade–in of the Chrysler Imperial. In addition, Mrs. Bottiger sold various guardianship motor vehicles without prior approval of the court and without reporting their sale to the court, and invested the sum of $795 in mining stock and made cash loans to her children by a former marriage, $2,780.85 of which was not repaid.

Mr. Brommers completed his logging operations on the three tree farms sometime in 1968, patently past the 8–month time limitation in the court order. Contrary to the written agreement authorized by the court, but in accordance with his oral agreement with Mrs. Bottiger, Mr. Brommers had removed all merchantable timber of every species, including poles, from the three parcels of land. The Brommers realized a net profit in excess of $30,000 from their logging operations.

Prior to trial, the parties stipulated that the fair market value of the standing timber logged by Mr. Brommers was

$59,045.51. The trial court found the value to the guardianship of the timber lawfully logged to be $9,728.10, *i.e.*, the value of the alder, maple, and cottonwood logged within 8 months from the date of the court order. The trial court also found the Brommers had paid $59,169.13 to Mrs. Bottiger for all timber logged, of which $9,728.10 was paid for timber lawfully logged. The balance, $49,441.03, was the amount the Brommers paid Mrs. Bottiger for timber unlawfully logged.

Using the above figures, the trial court concluded the Brommers had logged $49,317.41 worth of timber from the guardianship property without lawful authority. Pursuant to RCW 64.12.030,[2] the trial court assessed treble damages against the Brommers in the amount of $147,952.23. Against these damages, the court set off $49,441.03, which was paid by the Brommers to Mrs. Bottiger for the unlawfully logged timber and entered judgment against the Brommers for $98,511.20. In assessing the treble damages against the Brommers, the trial court found the Brommers did not have probable cause to believe Mrs. Bottiger had authority to authorize the logging of all merchantable timber and thus were not entitled to rely on RCW 64.12.040,[3] which mandates single damages only when certain mitigating circumstances are found to exist by the trier of fact.

---

[2]"Whenever any person shall cut down, girdle or otherwise injure, or carry off any tree, timber or shrub on the land of another person, or on the street or highway in front of any person's house, village, town or city lot, or cultivated grounds, or on the commons or public grounds of any village, town or city, or on the street or highway in front thereof, without lawful authority, in an action by such person, village, town or city against the person committing such trespasses or any of them, if judgment be given for the plaintiff, it shall be given for treble the amount of damages claimed or assessed therefor, as the case may be." RCW 64.12.030.

[3]"If upon trial of such action it shall appear that the trespass was casual or involuntary, or that the defendant had probable cause to believe that the land on which such trespass was committed was his own, or that of the person in whose service or by whose direction the act was done, or that such tree or timber was taken from uninclosed woodlands, for the purpose of repairing any public highway or bridge upon the land or adjoining it, judgment shall only be given for single damages." RCW 64.12.040.

As for Mrs. Bottiger, the trial court found her liable to the guardianship estate for the cash she received from the sale of the timber ($10,349.18) and for the money she received from the sale of the logging equipment ($7,090.82) and the sale of various guardianship motor vehicles ($3,575.85), all of which she never accounted for in her reports to the court. The court entered judgment against Mrs. Bottiger for $21,015.85. The trial court also found that Mrs. Bottiger's actions in authorizing the logging of all merchantable timber without regard to market conditions then existing and without court authority constituted commissive waste of guardianship real property. The court found the damages to the guardianship real property for the waste committed thereon to be the value of the standing timber which was removed without court authority, *i.e.,* $49,317.41. Pursuant to RCW 64.12.020,[4] the court trebled this figure and assessed damages against Mrs. Bottiger in the amount of $147,952.23. Set off against this amount was the sum of $49,441.03, which Mrs. Bottiger received from the Brommers. Accordingly, judgment was entered against Mrs. Bottiger in the amount of $98,511.20. The trial court also awarded respondent $10,500 in attorney fees against Mrs. Bottiger in accordance with RCW 64.12.020.

On appeal, appellants Brommers' numerous assignments of error can be set forth in two categories: (1) The court erred in finding that Mr. Brommers had entered into a written contract with Mrs. Bottiger in accordance with the

---

[4]"If a guardian, tenant in severalty or in common, for life or for years, or by sufferance, or at will, or a subtenant, of real property commit waste thereon, any person injured thereby may maintain an action at law for damages therefor against such guardian or tenant or subtenant; in which action, if the plaintiff prevails, there shall be judgment for treble damages, or for fifty dollars, whichever is greater, and the court, in addition may decree forfeiture of the estate of the party committing or permitting the waste, and of eviction from the property. The judgment, in any event, shall include as part of the costs of the prevailing party, a reasonable attorney's fee to be fixed by the court. But judgment of forfeiture and eviction shall only be given in favor of the person entitled to the reversion against the tenant in possession, when the injury to the estate in reversion is determined in the action to be equal to the value of the tenant's estate or unexpired term, or to have been done or suffered in malice." RCW 64.12.020.

court order authorizing such an agreement and in admitting exhibit 16 (Mrs. Bottiger's attorney's conformed office copy of the original agreement); and (2) the court erred in finding that the Brommers did not have lawful authority to log all merchantable timber and did not have probable cause to believe Mrs. Bottiger had court approval to authorize the logging of all merchantable timber so that single damages only should have been assessed against the Brommers under RCW 64.12.040.

Appellant Bottiger has assigned error to the trial court's finding that she committed waste upon guardianship real property and to all of the trial court's conclusions of law in which she was found liable to the guardianship estate. Mrs. Bottiger's sole contention is the trial court could not find her liable to the guardianship estate without first making findings whether the guardianship property was community property or Mr. Bottiger's separate property.

We first deal with the claims of the Brommers.

Assuming, without deciding, the trial court erred in finding that Mr. Brommers had signed the written agreement and in admitting exhibit 16, the judgment for treble damages against the Brommers must still be affirmed.

The rules in Washington for awarding treble damages under RCW 64.12.030 and .040 are well established, as are the reasons for the rules. A person who willfully or recklessly cuts down and removes trees from the land of another is liable to the latter for treble damages. Willfullness or recklessness may be shown by circumstantial evidence. *See Smith v. Shiflett,* 66 Wn.2d 462, 403 P.2d 364 (1965); *Blake v. Grant,* 65 Wn.2d 410, 397 P.2d 843 (1964); *Fredericksen v. Snohomish County,* 190 Wash. 323, 67 P.2d 886, 111 A.L.R. 75 (1937); *Ventoza v. Anderson,* 14 Wn. App. 882, 545 P.2d 1219 (1976); *Longview Fibre Co. v. Roberts,* 2 Wn. App. 480, 470 P.2d 222 (1970). Once the plaintiff has proven the trespass and the damages, the burden shifts to the defendant to show the trespass was casual or involuntary or was done with probable cause to believe the land was his own or that of the person in whose service

or by whose direction the act was done, so that single damages only would be awarded to the plaintiff. *See Smith v. Shiflett, supra; Longview Fibre Co. v. Roberts, supra.* The reasons for the treble damages rule are threefold: (1) to punish the voluntary trespasser; (2) to provide a rough measure of future damages to the owner of the timber; and (3) to discourage persons from carelessly or intentionally removing another's merchantable timber on the gamble the enterprise will be profitable if actual damages only are incurred. *Guay v. Washington Natural Gas Co.*, 62 Wn.2d 473, 383 P.2d 296 (1963).

■■ There is substantial evidence in the record to support the trial court's finding that respondent was entitled to treble damages against the Brommers. The evidence substantially reveals the Brommers knew that Mrs. Bottiger was acting as guardian of Mr. Bottiger's estate and that Mr. Bottiger had an ownership interest in the three parcels on which the logging operations were conducted. Also, the evidence reflects they had direct knowledge that Mrs. Bottiger was not dealing fairly and in good faith with the guardianship estate when they made cash payments to her with the understanding that she was requesting these cash payments so that she would not have to report them to the court. Further, on cross–examination of Mrs. Bottiger by respondent's counsel, she confirmed her earlier testimony from her deposition that Mr. Brommers knew she did not have authority to authorize the logging of all merchantable timber and that they decided to go ahead and take the risk of logging all merchantable timber anyway.[5] It is well within the province of the trial court to

[5]"Q. What did you tell your brother about this business? A. Well, he knew that I didn't, really didn't have the right— Q. Right to do it? A.—(continuing) right to do it. Q. And he knew you had talked to Mr. Pemberton and Mr. Pemberton wasn't going to let you go ahead— A. Right. Q.—(continuing) and log the other stuff? A. (Witness nods head.) Q. And you and he just decided you were going to go ahead anyhow? A. We were going to go ahead anyway. Q. And he knew he was taking some risk and you knew you were taking some risk? A. Right. Q. Did you give those answers to those questions at your deposition? A. Yes, I did."

find creditable Mrs. Bottiger's testimony and to disregard the testimony of the Brommers that they did not know she did not have court approval to authorize the logging of all merchantable timber. *See Hughes v. Stusser,* 68 Wn.2d 707, 415 P.2d 89 (1966). There is substantial evidence in the record to support the trial court's findings that the Brommers did not have probable cause to believe Mrs. Bottiger had authority to order the logging of all merchantable timber and that the Brommers could have believed the claim by Mrs. Bottiger of such authority only by failing to make reasonable inquiry regarding her authority or by a deliberate purpose to avoid learning the truth. When there is substantial evidence in the record to support the trial court's findings, these findings will not be disturbed on appeal. *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959). The trial court's judgment of treble damages against the Brommers is affirmed.

Turning to Mrs. Bottiger's appeal, her assignments of error come down to the single contention that she cannot be held liable to the guardianship estate of her husband without the trial court first making a specific finding whether the guardianship property involved herein was community or separate property.

A similar contention was made in *In re Youngkin,* 48 Wn.2d 425, 294 P.2d 423 (1956), by a husband who was appointed guardian of his incompetent wife's estate. The husband had filed an inventory with the court listing their community property and his wife's separate property. He made gifts of certain community property and moneys to his daughter and granddaughter, neither of whom were related to the wife. After the wife died, the administrator of her estate objected to these gifts and sought recovery from the husband. In opposition to the administrator, the husband argued that as manager of the community property he had authority to make these gifts without prior approval of the court. On appeal, we noted that the husband had listed and valued all of the community property in the inventory

and had taken an oath to perform all legal duties required of him in his capacity as guardian. In affirming the judgment against the husband, we held the husband could not ignore his obligations as guardian and flout the court's control over the property of the ward. *In re Youngkin, supra* at 430.

We believe the principles applied in *Youngkin* are also applicable to Mrs. Bottiger. She listed all of the community property in the inventory she filed with the court. She voluntarily chose to become guardian of her husband's estate, and thus, voluntarily assumed all of the obligations and duties placed on a guardian of an incompetent's estate. Among these duties was the duty to protect and preserve the estate and account for the estate faithfully, *see* RCW 11.92.040(4), and the duty to petition the court for the sale of any real or personal property of the estate. *See* RCW 11.92.090. Once she had placed the community property in the guardianship estate, she was required to deal with this property in the same manner as a guardian who has no interest in the ward's property.

We recognize that this situation in some ways restricts a guardian spouse's usual powers of management and control over community property which are given to that spouse by RCW 26.16.030. However, the ward also has an interest in the ownership, management, and control of community property, and ultimately it is the court's duty to protect the ward's interests. The court having jurisdiction of a guardianship matter is said to be the superior guardian of the ward, while the person appointed guardian is deemed to be an officer of the court. *See Grayson v. Linton,* 63 Idaho 695, 125 P.2d 318 (1942); *In re Duren,* 355 Mo. 1222, 200 S.W.2d 343, 170 A.L.R. 391 (1947); *In re Clendenning,* 145 Ohio St. 82, 60 N.E.2d 676 (1945); *In re Estate of Hilton,* 72 Wyo. 389, 265 P.2d 747, 43 A.L.R.2d 1429 (1954). Washington guardianship statutes are in accord. *See* RCW 11.92.010.

We also point out that title to the ward's property does not vest in the guardian; title remains in the ward. *See* J.

Woerner, *A Treatise on the American Law of Guardian-ship of Minors and Persons of Unsound Mind* § 137, at 452 (1897); Restatement (Second) of Trusts § 7, comment *a* (1959). Thus, a spouse who voluntarily chooses to become guardian of the other spouse's estate and voluntarily places their community property in the estate must be deemed to have given up some rights in the control and management of community property. This must be so in order to give the court effective supervisory control over the ward's property and interests. However, in saying this, we are in no way intimating that the court's obligation to insure the well–being of the ward's spouse and family is diluted. The court is charged with both the duty of protecting and pre-serving the ward's estate and the duty of maintaining the ward's family at its former standard of living, if possible. In balancing these interests, which can be a delicate process in some situations, the court must be involved in the decision–making process whether to sell the ward's property. The only way the court can become involved in this decision–making process is if the guardian petitions the court for authority to sell the guardianship property. The guardian spouse cannot be allowed to sell guardianship property, including community property placed in the guardianship estate, without first obtaining approval by the court.

The facts in the present case amply support the trial court's findings and conclusions as to Mrs. Bottiger. Mrs. Bottiger knew she needed court approval before she could sell guardianship property, and she knew she had a duty as guardian to report all receipts and disbursements of guard-ianship funds. In spite of this knowledge, she requested some cash payments from the sale of the timber for the specific purpose of concealing their receipt from the court. She also sold guardianship logging equipment and various motor vehicles, concealed the receipt of some of the pro-ceeds from these sales, and used these proceeds to finance personal trips and to make personal investments, including loans to her children by a former marriage, some of which

were not repaid. The trial court correctly held her liable to the guardianship estate for these amounts.

As for the assessment of treble damages against Mrs. Bottiger for committing waste on guardianship real property, RCW 64.12.020 is mandatory in the sense that treble damages must be awarded if a guardian or tenant of real property commits waste thereon and the plaintiff prevails. *See Graffell v. Honeysuckle,* 30 Wn.2d 390, 191 P.2d 858 (1948). The only two conditions to the assessing of treble damages are: (1) the plaintiff must prevail; and (2) the guardian of real property commits waste thereon.

■ The first condition has been met here. As for the second condition, we have previously held that a tenant is liable for treble damages under RCW 64.12.020 when the tenant voluntarily and deliberately abuses or destroys real property which results in substantial injury to the freehold.

> Voluntary waste, sometimes spoken of as commissive waste, consists of the commission of some deliberate or voluntary destructive act, such as pulling down a house, *or removing things fixed to and constituting a material part of the freehold.*

(Italics ours.) *Graffell v. Honeysuckle, supra* at 398; *accord, Kane v. Timm,* 11 Wn. App. 910, 527 P.2d 480 (1974); *Dorsey v. Speelman,* 1 Wn. App. 85, 459 P.2d 416 (1969). Removal of timber which does not amount to good husbandry of the land, or removal of a substantial amount of timber from land having a value primarily for its timber are classic examples of waste. *See Crodle v. Dodge,* 99 Wash. 121, 168 P. 986 (1917); *Rayonier, Inc. v. Polson,* 400 F.2d 909, 919 (9th Cir. 1968); *McNichol v. Eaton,* 77 Me. 246, 252 (1885); *Anderson v. Anderson,* 97 S.W.2d 513 (Tex. Civ. App. 1936).

The facts in the present case clearly establish that waste was committed on guardianship real property by Mrs. Bottiger. She knew that the three parcels of land were designated as tree farms, thus their chief value was in producing timber for future selective cutting. The evidence overwhelmingly demonstrated that Mrs. Bottiger desired

the logging of all merchantable timber on the three parcels in order to provide for her own personal needs and wants. The guardianship estate was in no need of income to provide for the maintenance of Mr. Bottiger or his family. Therefore, both conditions for treble damages under RCW 64.12.020 were met by respondent and the trial court properly assessed treble damages against Mrs. Bottiger.

The judgment of the trial court in both appeals is affirmed.

WRIGHT, C.J., and ROSELLINI, STAFFORD, UTTER, BRACHTENBACH, HOROWITZ, DOLLIVER, and HICKS, JJ., concur.