[No. 52135-2. En Banc. October 2, 1986.]

FISHER PROPERTIES, INC., *Respondent,* v. ARDEN–MAYFAIR, INC., *Appellant.*

*Helsell, Fetterman, Martin, Todd & Hokanson,* by *William A. Helsell* and *Bradley H. Bagshaw,* for appellant.

*Graham & Dunn,* by *Edward W. Pettigrew* and *Douglas C. Berry,* for respondent.

DURHAM, J.—This case involves a complex dispute over a lessee's obligations to repair and restore leased premises upon the termination of a lease which lasted for over 50 years. Arden–Mayfair, Inc. (Arden), the lessee, appeals from a trial court judgment holding that it breached the lease by failing to repair and restore the premises in the condition required by the lease. Arden challenges the trial court's award of damages to Fisher Properties, Inc. (Fisher), the lessor, on a number of grounds. Arden further contends that the trial court erred in its award of attorney fees to Fisher. Fisher cross–appeals from the trial court's decision not to award treble damages for certain aspects of Arden's conduct. We affirm in part and reverse in part the trial court's award of damages. The award of attorney fees is reversed. We deny Fisher's request on its cross appeal.

On June 30, 1923, the predecessors of the parties in this case executed a lease of several lots in a block on the Seattle tidelands. There is no evidence as to which party drafted the lease. Fisher is the successor in interest to the lessor, and Arden is the successor to the lessee. In the lease, the lessor agreed to construct a 2–story building designed for the manufacture of ice cream on the premises at its own expense. Paragraph 27 of the lease provided that the lessee would pay for "the cost of making any installation at the time of the construction of the building" for machinery or any other features pertaining to the lessee's business, and all other machinery or equipment installed in the building except for certain features in the office portion. It further

stated that "[a]s a part consideration of making this lease", the lessee agreed to install the above features, "including special equipment and machinery for the manufacture of ice and ice cream in said building to cost not less than $125,000, all of the same to be installed promptly after the building is ready for same, all of said machinery and equipment to be free and clear of encumbrances . . ." The lease permitted the lessee to use the premises for the manufacture and sale of ice cream or for any other legitimate purpose. The lease term was 25 years.

Paragraph 8 of the lease contained a repair covenant. It provided, in part:

> The Lessee covenants that it will, throughout said term, at its own expense, make and do all repairs of all kinds, both inside and outside the demised premises, including the roof and walls thereof, and keep the same in good order and repair, damage by fire excepted; and observe and be responsible for and bear all expenses of complying with all orders, ordinances, rules, regulations, requirements and inspections of all municipal, state and federal authorities relative to the demised premises, including the rules and regulations of the Health Officer, Fire Marshal, Building Inspector or other proper officer of the City of Seattle, Washington. The Lessee agrees that it will not permit or suffer any waste, damage or injury to the said building or premises, and will at its own expense keep all drainage pipe free and open and will protect water, heating and other pipes so that they will not freeze or become clogged and will repair all leaks, and also repair all damages caused by leaks, or by reason of its failure to repair and keep free and unfrozen any of the pipes or plumbing on said premises. . . .

Paragraph 11 of the lease contained a surrender covenant. That paragraph provided:

> The Lessee covenants that it shall and will, on the last day of the term hereby demised, or on the last day of the renewal thereof, if this lease shall be renewed, peaceably and quietly leave, surrender and yield up unto the Lessor the demised premises, including all additions and improvements added thereto by either of the parties hereto . . . in as good state and condition as reasonable use and

wear and damage by fire will permit. In case Lessee shall put in or upon said premises any machinery, plumbing, coils, tanks, insulated partitions, appliances or apparatus of any kind, it . . . shall have the right to remove the same upon the termination of this lease . . . provided that any injury which may be caused to the walls, floors, ceiling or woodwork of the building by such removal shall be repaired and restored by Lessee. In case any alterations are made in said premises by Lessee, it is agreed that on the termination or expiration of this lease the said Lessee shall restore and repair the demised premises in their original condition, should the Lessor so desire; provided, however, that the Lessor may require any partitions, other than insulated ones, plumbing, other than that which is used in the manufacture of ice cream, ice or any by-product in connection with the manufacturing plant of said Lessee (this exception does not include soil or water pipes), lighting or power wiring to be left in and attached to said building at the termination of this lease.

Paragraph 13 of the lease provided:

The Lessee covenants and agrees that it will not make any structural alterations or improvements in the demised premises . . . without written consent of the Lessor, and all alterations, additions and improvements which shall be made shall be at the sole cost and expense of the Lessee and shall become the property of said Lessor, and shall remain in and be surrendered with the premises as part thereof at the option of the Lessor at the termination of this lease without disturbance, molestation or injury, subject to the provisions of paragraph 11. . . .

The building was constructed according to the lease and Arden began using it to manufacture ice and ice cream. In 1926, the parties executed an "Addenda and Lease", which leased more property in the same block to the lessee. The lessor agreed to construct on the leased premises a "warehouse-type building . . . tying it up with the present building". The lessee was required to pay for "all partitions, heating pipes or equipment, water or drain pipes, plumbing, sewerage, oil tanks, and/or any other thing, fixture or equipment pertaining particularly to the ice cream or powdered milk business". The 1926 agreement incorpo-

rated all relevant paragraphs of the 1923 lease, including paragraphs 8, 11 and 13. The agreement also extended the 25-year term of the 1923 lease an additional 3 years so that it would expire on April 1, 1952.

In 1950, the parties entered into a "Lease Extension Agreement", which extended the term of the two leases for 5 years. This was the first in a series of seven similar agreements, each of which extended the lease term for a period of between 2 and 5 years. All of these subsequent agreements were made subject to the covenants and conditions of the original lease, with minor modifications not relevant to the issues in this case.

In the 1920's, Arden built a garage on land it owned next to the factory. The garage was connected to the warehouse building. In December 1960, Fisher purchased this garage and the underlying land from Arden. Fisher then leased the garage and the land back to Arden in the parties' 1960 lease extension agreement. That agreement made the garage subject to the covenants and conditions of the original lease.

The last agreement between the parties, made in 1975, extended the lease term for a period of 5 years, beginning April 1, 1977. This agreement gave the lessee the option to terminate the lease upon not less than 1 year's written notice. Pursuant to this option, on June 9, 1978, Arden gave Fisher a 1-year notice that it was terminating the lease. The parties later agreed that the termination of the lease would be effective on June 30, 1979.

Arden continued to conduct business activities on the premises until at least April 1979. On March 28, 1979, Fisher's president, Donald G. Graham, Jr., sent a letter to John C. Tucker, an Arden representative, in which he called Arden's attention to paragraphs 8, 11 and 13 of the lease. At about the same time, Fisher hired William Thomas of Olympic Products, Inc. to review the premises and advise Fisher of their condition. Thomas made a number of reports to Fisher. At a meeting on June 6, 1979, Graham handed Tucker the most extensive of these

reports. Graham told Tucker that Fisher wanted Arden to repair and restore the premises to their original condition as required by paragraph 11 of the lease. In a letter dated July 23, 1979, Graham told Tucker that Fisher had "no alternative but to exercise our option under Paragraph 11 of the Lease to require you to restore and repair the premises in their original condition in all cases where alterations have been made."

In a letter dated September 26, 1979, Graham informed Tucker that because Fisher had concluded it could not rent or otherwise use the building on an economically feasible basis, it had decided to tear the building down, and that demolition would begin around November 1. Graham further informed Tucker that Fisher planned to arrange for an examination of the building by experts should litigation with Arden ensue. Graham stated that Fisher was giving Arden advance notice of the demolition so Arden would have an opportunity to conduct its own inspection of the premises.

Fisher hired the Austin Company (Austin) to examine the building. Austin prepared two reports which Fisher introduced into evidence at trial. These reports itemized and estimated the cost of architectural, electrical and mechanical work which Austin considered necessary for Arden to comply with the lease. In preparing these reports, Austin personnel inspected the existing buildings and referred to drawings which had been submitted to the Seattle Building Department for building permits in the 1920's. In determining the cost of placing the premises in their original condition, Austin interpreted "original condition" to mean the buildings' original configuration, not including equipment Arden had initially installed pursuant to the lease.

The first Austin report, however, did not contain estimates of all work necessary to place the premises in their original condition according to this interpretation. If Austin found an item that did not conform to the original configuration, but was in reasonable repair, it did not estimate the

cost of removing it. However, it did estimate the cost of returning items needing extensive repair to their original configuration. The first Austin report concluded it would cost $835,700 to perform all the work identified.

In contrast, in its second report, Austin included all the work it considered necessary to return the premises to its concept of the original condition. This report included the estimated costs of removing all items that did not conform to Austin's idea of the original condition and the costs of rebuilding items according to that condition. The second Austin report estimated that it would cost $1,089,400 to place the building in the condition required by the lease.[1]

On February 11, 1981, Fisher filed a complaint against Arden in King County Superior Court alleging that Arden had breached the lease by failing to make the repairs and restorations required under the lease. Fisher asked for damages of at least $835,700. On February 1, 1983, Fisher notified Arden that at the commencement of trial, it would expand its prayer for relief to include treble damages and attorney fees pursuant to RCW 64.12.020 for the commission of waste. The trial lasted approximately 11 weeks. Many witnesses testified and over 200 exhibits were introduced into evidence.

The trial court held that Arden breached paragraphs 8, 11 and 13 of the lease. It found that Arden had breached the repair covenant in paragraph 8 by failing to make repairs when prudent and reasonable management would dictate they should be made. It found Arden had permitted and committed waste, damage, and injury to the premises, contrary to the parties' intentions in paragraph 8. It also found Arden breached paragraph 8 and the first sentence of paragraph 11 by returning elements of the building at the termination of the lease in a condition of repair substandard to that which reasonable management would require. It also held Arden breached the compliance with codes clause in paragraph 8. The court held Arden breached the

---

[1]Eventually, the building was demolished.

second sentence of paragraph 11 by failing to repair damage caused by removal of certain items from the premises. It further held that Arden breached the third sentence of paragraph 11 and paragraph 13 by failing to restore the premises to their original condition on termination of the lease as required by Fisher.

The court awarded Fisher damages of $1,089,400, finding that this sum represented the reasonable expenditures that would be required to repair and restore the premises to the condition required by the lease. In addition, it awarded Fisher consequential damages of $117,000 for lost rental income during the time necessary to place the premises in the condition required by the lease. The court further found that two aspects of Arden's conduct constituted commissive waste and awarded treble damages for those elements under RCW 64.12.020. Finally, the court awarded Fisher $231,713.75 in attorney fees.

Arden appeals from the trial court's awards of damages and attorney fees. Fisher cross–appeals, contending the trial court erred by not awarding Fisher treble damages under RCW 64.12.020 for certain aspects of Arden's conduct.

## I
### THE LESSEE'S OBLIGATION TO RESTORE THE PREMISES TO THEIR ORIGINAL CONDITION

The first issue we must address is if the trial court correctly construed the lease provision concerning Arden's obligation to restore the premises in their original condition. The third sentence of paragraph 11 states, "In case any alterations are made in said premises by Lessee, it is agreed that on the termination or expiration of this lease the said Lessee shall restore and repair the demised premises in their original condition, should the Lessor so desire . . ." Arden contends the trial court erred in its interpretation of this provision and its determination of Arden's obligations thereunder.

First, Arden argues that the trial court erred in holding

Arden liable for its failure to remove equipment which it had originally installed in the building when it was first constructed. Arden contends that, under the lease, this equipment became part of the building's "original condition", and the trial court should not have construed its obligation to restore the premises to their original condition to include removal of such equipment.

We conclude that the lease indicates that the original condition of the building included equipment Arden installed pursuant to the lease when the building was first constructed and, therefore, Arden is not liable for failing to remove it. Under paragraph 27, Arden was required to install equipment in the building "[a]s a part consideration of making this lease". Generally, where a lease requires a tenant to install articles on the premises as consideration for the lease, the tenant may not remove them. 2 M. Friedman, *Leases* § 24.2 (2d ed. 1983). This indicates that Arden had no right to remove the equipment it initially installed under paragraph 27 and therefore that such equipment became part of the premises. Additionally, it is reasonable to interpret "original condition" to mean the condition of the premises once both parties' construction and installation obligations under paragraph 27 were completed. Finally, when paragraphs 11 and 27 are compared, it appears that the lease distinguishes between items that the lessee initially installed in the premises and subsequent installations. While paragraph 27 concerns installations which Arden was required to make at the time of the construction of the building, paragraph 11 deals with additional features which Arden could incorporate later at its discretion. The second sentence of paragraph 11 provides that "[i]n case Lessee shall put in or upon said premises" certain items, it shall have the right to remove them upon the termination of the lease. This sentence appears to refer to the disposition of items which the lessee added to the premises at its discretion rather than items it was required to install initially under paragraph 27. The third sentence of paragraph 11 states, "In case any alterations are made",

the lessor may require the lessee to return the demised premises in their original condition. This introductory clause must refer to modifications which Arden might choose to make after it completed the required initial installations pursuant to paragraph 27. It would be odd to construe "alterations" as including items which the lease required Arden to install. It is more sensible to interpret "alterations" to signify changes made after the completion of the facility contemplated in paragraph 27. If "alterations" are changes made after the initial installations, the "original condition" must mean the premises including the initial installations.

■ Thus, the trial court incorrectly determined Arden's general obligations under the lease provision for restoration of the premises to their original condition. Considering the lease as a whole and the plain language of the third sentence of paragraph 11, the following construction is reasonable. Where Arden made changes in the premises after the installations it made initially under paragraph 27, Fisher could require Arden to restore those altered aspects of the premises to their original condition. The original condition is the configuration of the premises at the completion of the construction contemplated by paragraph 27; in other words, the original condition includes the installations initially made by Arden pursuant to the lease. Accordingly, Arden was only required to remove features it had added above and beyond the original installations and the trial court erred in requiring Arden to pay the cost of removing equipment and other features which it had initially installed in the premises.

Arden also contends that the trial court misconstrued the meaning of the phrase "original condition" in the lease as it is applied to the garage portion of the premises. The trial court essentially concluded that Arden was required to restore the garage to its condition in the 1920's, when it was built. Arden argues, however, that since Fisher did not lease the garage to Arden until 1960, Arden should not be required to restore it to its 1920's condition.

The lease itself does not clearly indicate what "original condition" means with respect to the garage. The 1960 agreement in which Fisher leased the garage to Arden merely states that the garage is "added to the leased premises" and "made subject to all of the covenants and conditions" of the original lease. Fisher argues that since this agreement provided that the garage was subject to the covenants of the original lease, and the "original condition" of the premises under the original lease was the 1920's condition, Arden was required to restore the garage to its 1920's condition. However, the fact that the garage was subject to the covenants in the original lease only means that Fisher could require Arden to restore the garage to its original condition; it does not indicate if that condition is the 1920's or 1960 condition.

The role of the court is to determine the mutual intentions of the contracting parties according to the reasonable meaning of their words and acts. *Dwelley v. Chesterfield,* 88 Wn.2d 331, 560 P.2d 353 (1977). When a provision is subject to two possible constructions, one of which would make the contract unreasonable and imprudent and the other of which would make it reasonable and just, we will adopt the latter interpretation. *Dickson v. United States Fid. & Guar. Co.,* 77 Wn.2d 785, 790, 466 P.2d 515 (1970). When the parties entered into the 1960 agreement leasing the garage, they could not reasonably have intended that when the lease terminated, Fisher could require Arden to restore the garage to its condition some 40 years before they made that agreement. It would be peculiar to require a lessee to return a facility to a condition which existed long before that facility was leased. In the absence of any language specifically indicating an intent to impose such an obligation, we will not infer it. The more reasonable construction is that the "original condition" of the garage was its condition in 1960 when the lease term began. Thus, Arden was required to restore the garage to its 1960 condition, and the trial court erred in awarding Fisher damages for the cost of restoring the garage to its 1920's condition.

## II
## THE LESSEE'S REPAIR OBLIGATIONS

The next issue concerns the trial court's assessment of Arden's repair obligations under the repair and surrender covenants of the lease. The pertinent part of the repair covenant provides that the lessee "will, throughout said term, at its own expense, make and do all repairs of all kinds, both inside and outside the demised premises, including the roof and walls thereof, and keep the same in good order and repair, damage by fire excepted . . . ." The surrender covenant provides that when the lease terminates, the lessee will "surrender and yield up unto the Lessor the demised premises, including all additions and improvements added thereto by either of the parties . . . in as good state and condition as reasonable use and wear and damage by fire will permit." The trial court found that these two provisions, read together, meant that "no component or element of the building which was required to be returned at the termination of the Lease be in a state or condition beyond (substandard to) its normal maintenance cycle." It concluded that Arden was to perform whatever repairs and maintenance were necessary to keep the premises in good repair throughout the lease term, and that to the extent Arden failed to keep the premises in good repair within the applicable maintenance cycle, it was required to correct those deficiencies under the surrender covenant. It held that Arden breached these obligations and awarded Fisher damages therefor.

Arden first argues that the trial court erred in finding that this lease was a long–term triple net lease and in construing Arden's repair obligations accordingly. The length of a lease is a relevant factor in determining a lessee's repair obligations. In a long–term net lease, the tenant has a virtually complete obligation to repair, whereas in a short–term lease the tenant's obligation is comparatively less. 1 M. Friedman, *Leases* § 10.8 (2d ed. 1983). Arden argues that since 1952, when the original lease term expired, the parties had been engaged in a series of short–

term leases, rather than a single, long–term lease. We disagree with Arden's characterization of this transaction. Although each agreement executed after the original agreement covered a short period, taken together these agreements constituted a single, comprehensive transaction. Several factors indicate that the agreements subsequent to the original agreement constituted a continuation of the original lease. First, the terms and conditions of the original lease remained in effect as to succeeding agreements. The agreements subsequent to the original agreement also stated that they extended the lease term. Finally, from 1960 on, every lease extension agreement referred to the original lease, its addenda and extensions, as "said Lease", indicating that the series of agreements constituted a single lease. Therefore, we conclude that the trial court reasonably construed the lease in this case as a long–term lease. Since the lease is long term, it is proper to construe broadly the lessee's repair obligations thereunder.

Arden next contends the trial court erred in interpreting the repair and surrender covenants by failing to consider the depreciation of the building resulting from Arden's reasonable use. Arden argues that when the trial court held that Arden was required to keep every element of the premises which was to be returned at the termination of the lease within its "normal maintenance cycle", it failed to consider the provision for reasonable use and wear in the surrender covenant of the lease. Fisher responds, however, that the analysis used in the Austin reports and adopted by the trial court did give effect to both the repair covenant and the surrender covenant's provision for reasonable use and wear.

█ The initial question we must resolve is who has the burden of proving if repairs claimed are for damage which resulted from reasonable use and wear, and thus are not within the lessee's repair obligations under the lease. No prior case in Washington has answered this question, and other jurisdictions are split. *Compare Santini v. Kocher*, 38 Conn. Supp. 506, 509, 452 A.2d 318 (1982) *with Stegeman*

*v. Burger Chef Sys., Inc.,* 374 So. 2d 1130, 1131 (Fla. Dist. Ct. App. 1979). We hold that, while the lessee is responsible for introducing evidence that damage claimed by the lessor is due to reasonable use and wear, the lessor has the burden of proving that the damage is beyond reasonable use and wear. Because the lessor is the party claiming damages for a breach of the covenant, the lessor must bear the burden of proof.

Fisher argues that Arden produced no substantial evidence that any repair which Austin identified was for damage resulting from reasonable use and wear. Arden asserts, however, that the testimony of its expert appraiser, Stephen Olson, constituted such evidence. Olson's testimony indicates that normal use of the building for an ice cream factory caused some damage. However, Fisher also has produced substantial evidence that the condition of the premises was beyond what would result from reasonable use and wear. There is evidence in the record from Robert Grafer and Gorley Sauer that Austin took into account the building's age, use, and wear in determining the extent of necessary repairs. The estimates which Austin produced constituted substantial evidence of repairs required for damage which was beyond reasonable use and wear. Therefore, Fisher satisfied its burden of proving that the damages it sought were beyond the surrender covenant's provision for reasonable use and wear. We affirm the trial court's award of damages for Arden's failure to comply with its repair obligations under the repair and surrender covenants of the lease.

Arden also contends that the trial court's damages award and the Austin report on which it is based, contain the costs of certain repairs to utilities which were beyond the scope of Arden's repair obligations under the lease. Arden contends that the trial court erred by assessing damages for lighting repairs for which it was not responsible, for costs related to the boiler, and for testing and repairing radiators, water and sprinkler systems. In each of these matters, the record contains substantial evidence to support the trial

court, and we affirm those awards.

## III
### THE LESSEE'S OBLIGATIONS UNDER THE COMPLIANCE WITH CODES COVENANT

We next consider if the trial court erred by concluding that Arden breached the lease by failing to pay the expenses of bringing the premises into compliance with certain codes. Paragraph 8 of the lease contains a covenant providing:

> The Lessee covenants that it will . . . observe and be responsible for and bear all expenses of complying with all orders, ordinances, rules, regulations, requirements and inspections of all municipal, state and federal authorities relative to the demised premises . . .

The trial court found that Arden violated code provisions in two respects:

> First, Arden violated applicable code provisions with respect to service drops by having more than one service drop. Second, Arden did not comply with code provisions with respect to exit lights and unit equipment for emergency illumination.

The trial court concluded that Arden's failure to pay for repairs necessary to comply with these codes constituted a breach of the covenant quoted above. It awarded Fisher damages for the cost of revising the service entrance and installing lights and equipment for emergency illumination to comply with codes.

Initially, Arden argues that the trial court erred by finding that it violated any applicable code provisions. First, with respect to service drops, Fisher alleged Arden violated the National Electrical Code, section 230–2, which provides that generally a building shall be supplied by only one electrical service entrance. National Electrical Code § 230–2 (National Fire Protection Association 1978). There is evidence in the record that the City of Seattle implemented the National Electrical Code. Moreover, the evidence shows that Arden did indeed have more than one service drop. Thus, the evidence supports the trial court's finding that

Arden did violate this code provision.

Second, concerning exit lights, Fisher argued Arden violated WAC 296-24-56531 because the building lacked illuminated exit signs. Arden contends that this provision does not require any such illumination system. However, WAC 296-24-56531(6) does state that "[e]very exit sign shall be suitably illuminated by a reliable light source . . ." Therefore, it appears that Arden did not comply with applicable codes with respect to exit lights.

■ Arden further contends, however, that even if it did not comply with applicable codes, the lease did not obligate it to pay for repairs to bring the premises into compliance with codes unless it was required by inspectors to make such repairs. Arden relies on *Puget Inv. Co. v. Wenck,* 36 Wn.2d 817, 221 P.2d 459, 20 A.L.R.2d 1320 (1950), where this court construed a covenant similar to the one at issue here. In *Wenck,* city officials had notified the lessee that certain conditions on the premises violated city ordinances. We reasoned, however, that the lease did not obligate the lessee to pay the lessor for the cost of repairs necessary to comply with the ordinances, where the lessee had been able to use the premises without strict compliance with the laws and the city had not ordered the lessee to cease operations until it complied. *Wenck,* at 830. We held that a lease covenant of this kind should not be construed as an affirmative obligation to repair, alter or improve; rather, it was intended only to make the lessee responsible for any repairs which the lessee found necessary to use the premises, to indemnify the lessor for expenses resulting directly from unlawful use, and to provide a basis for the lessor to require the lessee to cease any unlawful activity. *Wenck,* at 831.

Under the rule established in *Wenck,* even if Arden violated code provisions, the lease covenant did not require Arden to pay Fisher for the costs of repairs to comply with the codes if government authorities never ordered Arden to make such repairs or shut down the premises for noncompliance. There is no evidence in the record that any government authority ever required Arden to make repairs to

bring the premises into compliance with codes. Therefore, the trial court erred in concluding Arden breached the lease by failing to pay the expenses of keeping the premises in compliance with codes. We reverse the trial court's award of damages for the costs of such compliance.

## IV
### THE MEASURE OF DAMAGES FOR THE LESSEE'S BREACH OF THE LEASE

The trial court found that the diminution in market value of the premises caused by Arden's breach of the lease exceeded the cost of repair and restoration to the condition required by the lease. It then awarded damages based on its assessment of the cost of repair and restoration. Arden contends there is no evidence to support the trial court's finding that the diminution in value of the premises exceeded the cost of repair and restoration, and that the trial court erred in awarding damages based on the latter measure.

Because we have reversed portions of the trial court's assessment of the costs of repair and restoration to the condition required by the lease, the trial court will recalculate these costs on remand, and it is unnecessary for us to determine if there was evidence to support the trial court's finding. However, we shall address the questions of law which the parties have raised concerning the appropriate measure of damages for the lessee's breach of a covenant in a lease to return the premises to a prescribed condition.

■ Generally, damages for the lessee's breach of a covenant to return the premises to a prescribed condition are measured by the costs of returning the premises to that condition. However, in some cases, that measure of damages may place the lessor in a better position than if the lessee had performed. In these situations, the diminution in market value of the premises resulting from the breach of the lease is an alternative measure of damages. If the cost of returning the premises to the condition required by the lease exceeds the diminution in market value of the prem-

ises due to the lessee's breach of the lease, the lessor's recovery may be limited to the diminution in value. 2 M. Friedman, *Leases* § 18.1 (2d ed. 1983). *See also James S. Black & Co. v. F.W. Woolworth Co.*, 14 Wn. App. 602, 611, 544 P.2d 112 (1975). The diminution in value is measured by the difference in value of the premises on today's market had the lessee returned them in the condition required by the lease and their value in the condition in which they were returned to the lessor. *James S. Black,* at 611.

Fisher and Arden disagree as to who has the burden of presenting evidence of the two alternative measures of damages. Generally, where a lessor claims damages for a lessee's breach of a covenant to return the premises in a particular condition, it is not the lessor's burden to produce evidence of both the cost of restoration and diminution in value. Rather, once the lessor has presented evidence of one measure of damages, the lessee has the burden of establishing that the other measure of damages is less. Thus, if the lessor introduces evidence of the cost of restoration, that measure of damages will be used unless the lessee produces evidence that the diminution in value of the premises is the smaller amount. 2 M. Freidman, at § 18.1. *Accord, Jenkins v. Etlinger,* 55 N.Y.2d 35, 39, 432 N.E.2d 589, 447 N.Y.S.2d 696 (1982); *Laska v. Steinpreis,* 69 Wis. 2d 307, 314, 231 N.W.2d 196 (1975).

We believe that the above approach is a sensible method for determining the proper measure of damages for a lessee's breach of a covenant to return the premises in a prescribed condition, and, therefore, we adopt it. The trial court is directed to use this approach in deciding the appropriate measure of damages for Arden's breach on remand.

## V
### THE AWARD OF DAMAGES FOR LOST RENTAL INCOME

The trial court found that it would have taken 1 year to complete the repairs necessary to place the premises in the condition required by the lease, and that the reasonable

lost rental income for this period was $117,000. It awarded Fisher this sum as consequential damages.

Arden challenges the trial court's award of damages for lost rent, relying on two different theories. First, Arden contends that Fisher unreasonably delayed giving notice that it wanted the premises restored to their original condition, thereby preventing Arden from restoring the premises during the lease term. Thus, Fisher cannot recover damages for lost rent during the time that would have been required for restoration. Arden observes that, while it gave Fisher the required 1–year notice of termination of the lease, Fisher did not notify Arden that it wanted the premises restored until 24 days before the termination of the lease. Arden contends that if Fisher had notified it of its desire shortly after Arden gave notice of termination, restoration might have been accomplished by the end of the lease term. Arden argues that Fisher's delay prevented it from restoring the premises before the end of the. lease term, and Fisher cannot take advantage of this by recovering damages for lost rent during the period required for repair. Arden relies on the principle that a party to a contract who prevents another from performing an obligation cannot recover for the nonperformance. *Hydraulic Supply Mfg. Co. v. Mardesich,* 57 Wn.2d 104, 105, 352 P.2d 1023 (1960).

Our review of the evidence, however, indicates that Fisher did not unreasonably delay giving notice to Arden of its desire that Arden restore the premises. The trial court found that Fisher gave Arden notice to restore the premises within a reasonable time and did not unreasonably delay enforcing any of its rights under the lease. There is substantial evidence to support these findings. The lease did not specify a particular time when Fisher had to provide notice of its desire that Arden restore the premises. Therefore, it was not unreasonable for Fisher to give Arden notice when it did. Furthermore, there is no evidence that Arden would have restored the premises had Fisher made its request earlier. In an unchallenged finding of fact, the

trial court stated that "[t]here is no credible evidence that Arden at any time changed its position to its detriment as a result of any action or nonaction by Fisher."

Arden's second argument is based on a different construction of the lease. Arden contends that the lease did not even require Arden to restore the premises before the end of the lease term. It notes that the lease states, "on the termination or expiration of this lease the said Lessee shall restore and repair the demised premises in their original condition, should the Lessor so desire". Arden asserts that this language contemplates that any restoration will occur after termination. Therefore, it could have complied with its obligations under the lease by beginning restoration in June 1979 when the lease term ended and finishing it in June 1980. Arden argues that, had it so performed, there would have been no breach and Fisher would have earned no rent, and by awarding Fisher rent for that year, the trial court put Fisher in a better position than it would have been in had Arden performed.

We disagree with Arden's argument that the language of the lease quoted above means that the restoration process must begin at the end of the lease term. We do not believe that this provision was specifically intended to establish the point in time when restoration would have to begin. Rather, it appears that this language was simply intended to establish the lessor's right to require the lessee to restore the premises once it was clear that the lease would terminate.

Once Fisher notified Arden that it wished it to restore the premises, Arden was obligated to do so under the lease. Arden did not, in fact, comply with this obligation. Where a lessee breaches a covenant to return the premises in a prescribed condition, it is proper to award damages for the lessor's loss of rent during the time needed to restore the premises to the condition required by the lease. 2 M. Friedman, *Leases* § 18.1 (2d ed. 1983); *Iverson v. Spang Indus., Inc.,* 45 Cal. App. 3d 303, 308, 119 Cal. Rptr. 399 (1975). We, therefore, affirm the trial court's award of damages for lost rental income.

## VI
### THE AWARD OF TREBLE DAMAGES
### FOR COMMISSIVE WASTE

We next review the trial court's holding that two aspects of Arden's conduct constituted commissive waste for which damages could be trebled. The trial court found that Arden "voluntarily and intentionally, committed substantial injury" to the premises in removing its equipment "by deliberately knocking holes in walls, removing headers, damaging floors, damaging ceilings, etc.", and by the manner in which it shut down refrigeration equipment. The court concluded that these actions constituted commissive waste and trebled the damages for them pursuant to RCW 64.12.020. Arden argues that the trial court erred in holding that these two aspects of Arden's conduct were commissive waste and, therefore, in awarding treble damages for them.

■ Commissive waste is "the commission of some deliberate or voluntary destructive act, such as pulling down a house, or removing things fixed to and constituting a material part of the freehold." (Italics omitted.) *Seattle–First Nat'l Bank v. Brommers,* 89 Wn.2d 190, 202, 570 P.2d 1035 (1977) (quoting *Graffell v. Honeysuckle,* 30 Wn.2d 390, 398, 191 P.2d 858 (1948)). Commissive waste is distinguished from permissive waste, which "implies negligence or omission to do that which will prevent injury, as, for instance, to suffer a house to go to decay for want of repair or to deteriorate from neglect." *Graffell,* at 398. RCW 64.12.020 provides that if a tenant of real property "commit waste thereon, any person injured thereby may maintain an action at law for damages" and "if the plaintiff prevails, there shall be judgment for treble damages . . ." Under RCW 64.12.020, treble damages must be awarded if the tenant commits waste and the plaintiff prevails. *Brommers,* at 202; *Graffell,* at 401–02.

First, Arden contends that it did not commit commissive waste in shutting down the refrigeration equipment. The evidence shows that the shutdown caused ice to melt, damaging the floor, and caused cork lining the walls to pull

away. Arden argues, however, that there is no evidence that the shutting down of the system was a deliberate or voluntary destructive act. The trial court found that Arden knew it would cause substantial injury to the premises in shutting down the refrigeration equipment in the manner in which it did. There is substantial evidence to support this finding, and we will not disturb it. *Brommers*, at 199. Furthermore, this finding supports the trial court's conclusion that such conduct constituted commissive waste, and thus, we affirm the trial court's award of treble damages for it.

Second, Arden argues it did not commit commissive waste in removing its equipment. It asserts that Fisher requested that it remove the equipment, and, therefore, any resulting damage could not have been commissive waste. However, the fact that a tenant has removed equipment in performing a duty to the landlord does not mean that the manner in which it removed it is not a deliberate or voluntary destructive act. The trial court seems to have found that the removal was a deliberate, destructive act because of the way Arden did it. There is substantial evidence in the record that the manner in which Arden removed equipment resulted in destruction to the premises. Therefore, we affirm the trial court's judgment of treble damages for commissive waste resulting from Arden's removal of equipment from the premises.

## VII
### ATTORNEY FEES

The final issue Arden raises is if the trial court's award of attorney fees was appropriate. Arden argues the trial court erred in awarding Fisher attorney fees for almost all of the services Fisher's attorneys provided in the case, because most of the judgment for damages was based on claims for which attorney fees were not authorized.

The lease itself contains no provision authorizing attorney fees. However, RCW 64.12.020, the statute providing for treble damages against a party who commits waste, states that "[t]he judgment . . . shall include as part of the

costs of the prevailing party, a reasonable attorney's fee . . ." Fisher had asked the trial court to treble the entire amount of damages assessed against Arden, arguing that all of Arden's conduct in breach of the lease constituted commissive waste for which damages should be trebled under RCW 64.12.020. The court, however, held that only two aspects of Arden's conduct constituted commissive waste and awarded treble damages for those, while the remainder of Arden's conduct was not commissive waste and thus warranted only single damages. It found total actual damages of $1,089,400, of which $64,382 constituted the damages for the acts of commissive waste (before trebling).

Fisher then asked the trial court to award attorney fees based on all legal services which Fisher's attorneys had provided in the case. The trial court awarded $231,713.75 in attorney fees. This sum constituted almost all of the fees Fisher had requested.

Arden argues that it was improper for the trial court to award Fisher practically all of the attorney fees it incurred in this case when only a portion of the damages awarded was for a claim for which fees were authorized. It contends that, although Fisher did achieve substantial success in its claim for actual and consequential damages, a fee award should not have been based on that fact because there was no authorization for attorney fees for that claim. Since the sole provision authorizing attorney fees in this case was the commissive waste statute, RCW 64.12.020, and only about 5.9 percent of the damages Fisher recovered ($64,382) was pursuant to this statute, Arden argues it was unjust for Fisher to be awarded virtually all of its attorney fees. Arden suggests that, instead of focusing on Fisher's general success in recovering actual and consequential damages, the trial court should have segregated the time Fisher's attorneys spent on the claim for which fees were authorized (the commissive waste claim) from time spent on the remainder of the case, and awarded attorney fees for only the former portion.

In Washington, attorney fees may be awarded only

when authorized by a private agreement, a statute, or a recognized ground of equity. *Mellor v. Chamberlin,* 100 Wn.2d 643, 649, 673 P.2d 610 (1983). When a party recovers both on claims for which attorney fees are authorized and claims for which there is no such authorization, it is proper to limit the fee award to the legal services provided on the former claims. *See Nuttall v. Dowell,* 31 Wn. App. 98, 105, 639 P.2d 832 (1982) (affirming a fee award limited to only that portion of plaintiff's action which was cognizable under a statute authorizing attorney fees). *Accord, Gray v. Don Miller & Assocs., Inc.,* 35 Cal. 3d 498, 509, 674 P.2d 253, 198 Cal. Rptr. 551 (1984); *Kosberg v. Brown,* 601 S.W.2d 414, 418 (Tex. Civ. App. 1980).

Fisher contends that its claims for commissive waste and breach of the lease were so interrelated that it would be difficult to apportion the time its attorneys spent on each. However, it would be unjust to allow Fisher to recover virtually all of its attorney fees because of complexity. Such an award would be inconsistent with the rule requiring authorization for fee awards, since most of Fisher's judgment was not based on a claim for which fees were authorized. If the only issue in this case had been Arden's liability for commissive waste, Fisher's attorneys would have spent considerably less time than they actually spent. Surely some of their efforts concerned the construction of the lease with respect to other issues. We direct the trial court to determine what portion of Fisher's attorneys' services would have been provided had only the commissive waste claim been raised, and to award only those fees attributable to those services.

## VIII
### The Trial Court's Conclusion That Certain Aspects of the Lessee's Conduct Did Not Constitute Commissive Waste

Finally, we reach the issue Fisher raises in its cross appeal. Fisher contends the trial court erred in concluding certain aspects of Arden's conduct did not constitute com-

missive waste, and, therefore, in not trebling damages for them. The trial court found that Arden "intentionally decided" "not to make necessary repairs or perform necessary maintenance . . . with respect to some elements and components to be returned . . . to Fisher"; "not to remove pipes, electrical equipment, and equipment foundations installed by it"; "not to remove certain other alterations made by it"; and "not to restore the leased premises to its original condition". The court further found that Arden knew that as a result of these decisions, the value of the premises would be substantially less, and/or that the premises would be substantially injured. The court assessed damages for the costs of repairing these items but determined the damages should not be trebled, concluding these items did not constitute commissive waste.

RCW 64.12.020 provides:

> If a . . . tenant . . . of real property commit waste thereon, any person injured thereby may maintain an action at law for damages . . . in which action, if the plaintiff prevails, there shall be judgment for treble damages . . . and the court, in addition may decree forfeiture of the estate of the party committing or permitting the waste . . .

Fisher makes two alternative arguments to support its claim for treble damages. First, Fisher argues that this court should construe RCW 64.12.020 as requiring damages to be trebled for permissive as well as commissive waste. No Washington case has directly addressed this issue. However, in *Graffell v. Honeysuckle,* 30 Wn.2d 390, 191 P.2d 858 (1948), this court implied that treble damages are unavailable for permissive waste. We read RCW 64.12.020 "to provide two distinct kinds of relief for damages resulting from waste occurring on real property: (1) treble damages for waste *committed* by a . . . tenant . . . and (2) forfeiture of the estate of the party committing or *permitting* the waste . . ." *Graffell,* at 401. This language suggests that this court interpreted the statute to authorize treble damages for commissive waste only, while forfeiture would

be allowed for either commissive or permissive waste.[2] Furthermore, in *Graffell,* this court clearly recognized a distinction between commissive and permissive waste, providing separate definitions for each type of waste. *Graffell,* at 398.

▇ We are not persuaded that the Legislature intended to authorize the recovery of treble damages for permissive waste in enacting RCW 64.12.020. This court has long held that punitive damages are not allowed unless expressly authorized by the Legislature. *Barr v. Interbay Citizens Bank,* 96 Wn.2d 692, 699, 635 P.2d 441, 649 P.2d 827 (1981). While RCW 64.12.020 clearly provides for treble damages for commissive waste, it contains no language expressly authorizing such recovery for permissive waste. If anything, the language implies that commissive and permissive waste are to be treated differently. Therefore, we decline to construe RCW 64.12.020 as requiring treble damages for permissive waste.

Alternatively, Fisher argues that even if RCW 64.12.020 only authorizes treble damages for commissive waste, that is the type of waste Arden inflicted on the premises when it intentionally decided not to perform certain acts. Fisher contends that an intentional failure to act with knowledge that injury to property will result should be considered commissive waste.

Under this court's prior definitions of commissive and permissive waste, it appears Arden's conduct was permissive waste. Commissive waste is the "commission of some deliberate or voluntary destructive *act*". (Italics ours.) *Brommers,* at 202 (quoting *Graffell v. Honeysuckle,* 30 Wn.2d 390, 398, 191 P.2d 858 (1948)). Permissive waste "implies negligence *or omission* to do that which will prevent injury, as, for instance, to suffer a house to go to decay

---

[2]Professor Stoebuck reads *Graffell* in this manner, citing it for the proposition that RCW 64.12.020 allows treble damages "in all cases of commissive, but not permissive, waste." Stoebuck, *The Law Between Landlord and Tenant in Washington: Part I,* 49 Wash. L. Rev. 291, 336 (1974).

for want of repair or to deteriorate from neglect." (Italics ours.) *Graffell,* at 398. A decision not to make repairs or remove items would be permissive waste, even if it is intentional, because no act occurs.

Fisher argues, however, that in *Dorsey v. Speelman,* 1 Wn. App. 85, 459 P.2d 416 (1969), the court affirmed a treble damages award for commissive waste based on a tenant's conscious refusal to act to prevent injury to the premises. Fisher reads *Dorsey* too broadly. *Dorsey* did not involve mere indifference to deterioration of the premises or failure to remove items. There were affirmative acts of waste, including destroying the interior of a house, tearing out walls and ceilings, destroying cabinets, and ripping out wiring. *Dorsey,* at 87. There simply was no evidence as to whether the tenants themselves had perpetrated the destructive acts. *Dorsey,* at 88. The court upheld a finding that waste was committed either by the tenants or with their knowledge, encouragement or consent. It affirmed a treble damages award for commissive waste, holding that "[t]he concept of 'commissive' waste does not require proof of a solitary personal performance by the tenant . . . A perpetrator of waste can act through an agent or participate as an aider and abettor." *Dorsey,* at 89–90. Thus, *Dorsey* simply held that a tenant may be liable for commissive waste done by a third person, not that any intentional failure to act to prevent injury to the premises is commissive waste.

Fisher also points out that this court has held in other contexts that intentional inaction may constitute affirmative conduct. *See, e.g., In re Miller,* 86 Wn.2d 712, 719, 548 P.2d 542 (1976) (intentional failure of nonresident to pay child support is commission of a tortious act under Washington's long–arm statute); *Adkisson v. Seattle,* 42 Wn.2d 676, 687, 258 P.2d 461 (1953) (intentional failure to act in disregard of the consequences may constitute wanton misconduct). Fisher argues that, likewise, Arden's intentional decision not to act, knowing injury to the premises would result, was tantamount to a positive act and, therefore, was

commissive waste.

Although we have held in other situations that an intentional failure to act is essentially an act, we do not believe that reasoning should apply in the context of waste. If we held that an intentional failure to act with knowledge that injury to the property will result constitutes the commission of an affirmative act of waste, the potential for awards of treble damages under RCW 64.12.020 would be much greater. Considering the punitive nature of such damages, such an expansion should not be allowed absent an express authorization from the Legislature. *See Barr,* 96 Wn.2d at 699. We conclude that an intentional failure to act to prevent injury to real property is not commissive waste for which damages may be trebled.

We affirm the trial court's decision that Arden's intentional decisions not to perform certain acts did not constitute commissive waste, and, therefore, that damages for such conduct should not be trebled.

## CONCLUSION

In summary, we affirm in part and reverse in part the trial court's judgment. We reverse the court's decision regarding Arden's obligations to restore the premises to their original condition. We hold that the trial court erred in requiring Arden to pay the cost of removing equipment and other features which it had initially installed in the premises pursuant to the lease, and the cost of restoring the garage to its 1920's condition instead of its 1960 condition. We affirm the trial court's award of damages for Arden's failure to comply with its repair obligations under the repair and surrender covenants of the lease. The court's award of damages for the costs of keeping the premises in compliance with codes is reversed. The award of damages for lost rental income is affirmed. We also affirm the trial court's judgment of treble damages for commissive waste and its holding that Arden's intentional decisions not to perform certain acts were not commissive waste and, therefore, did not warrant treble damages. Finally, we reverse

the trial court's award of attorney fees.

This case is remanded to the trial court for a reassessment of the damages and attorney fees to be awarded to Fisher consistent with this opinion.

DOLLIVER, C.J., UTTER, BRACHTENBACH, DORE, PEARSON, ANDERSEN, and GOODLOE, JJ., and WINSOR, J. Pro Tem., concur.

Reconsideration denied December 9, 1986.